# UNITED STATES DISTRICT COURT

NORTHERN        DISTRICT OF   ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

F I L E D

**UNDER SEAL**

DEC - 7 2008

V.

JUDGE JAMES F. HOLDERMAN
UNITED STATES DISTRICT COURT

CRIMINAL COMPLAINT   08 CR 1010

ROD R. BLAGOJEVICH, and
JOHN HARRIS

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

## Count One

From in or about 2002 to the present, in Cook County, in the Northern District of Illinois, defendants did, conspire with each other and with others to devise and participate in a scheme to defraud the State of Illinois and the people of the State of Illinois of the honest services of ROD R. BLAGOJEVICH and JOHN HARRIS, in furtherance of which the mails and interstate wire communications would be used, in violation of Title 18, United States Code, Sections 1341,1343, and 1346; all in violation of Title 18 United States Code, Section 1349.

## Count Two

Beginning no later than November 2008 to the present, in Cook County, in the Northern District of Illinois, defendants ROD R. BLAGOJEVICH and JOHN HARRIS, being agents of the State of Illinois, a State government which during a one-year period, beginning January 1, 2008 and continuing to the present, received federal benefits in excess of $10,000, corruptly solicited and demanded a thing of value, namely, the firing of certain Chicago Tribune editorial members responsible for widely-circulated editorials critical of ROD R. BLAGOJEVICH, intending to be influenced and rewarded in connection with business and transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the provision of millions of dollars in financial assistance by the State of Illinois, including through the Illinois Finance Authority, an agency of the State of Illinois, to the Tribune Company involving the Wrigley Field baseball stadium; in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

I further state that I am a  Special Agent of the Federal Bureau of Investigation  and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   X  Yes  _ No

Daniel W. Cain, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

December 7, 2008                          at          Chicago, Illinois
Date                                                           City and State

MICHAEL T. MASON, United States Magistrate Judge
Name & Title of Judicial Officer                        Signature of Judicial Officer

Northern District of Illinois )
)                                    **UNDER SEAL**
County of Cook, City of Chicago )

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Daniel W. Cain, hereinafter referred to as "Affiant," being duly sworn, state as follows:

## I.      INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Chicago, Illinois Field Division. I have been a Special Agent with the FBI for over twenty-two years. I am presently assigned to the West Resident Agency of the FBI's Chicago Field office. My duties include investigating corruption of public officials, mail fraud, wire fraud, and other white collar crimes. I have been involved in white collar crime investigations for a majority of my career as a Special Agent with the FBI.

2.      I have participated in and am familiar with this investigation through interviews and analysis of reports submitted by other Special Agents of the FBI, the Internal Revenue Service (IRS), the U.S. Postal Inspection Service (USPIS), and the U.S. Department of Labor's Office of Inspector General (DOLIG); personal interviews conducted with witnesses; my review of consensually-recorded conversations; a review of pen register information, trap and trace information, and telephone toll record information; and a review of information derived from the interception of wire communications occurring to and from certain telephones. I also am familiar with information derived from the interception of oral communications occurring in the offices of Friends of Blagojevich, 4147 North Ravenswood

Avenue, Suite 300, Chicago, Illinois. In addition, I am familiar with testimony given during the trial of Antoin Rezko from March to May 2008.

3.     This affidavit is submitted in support of an application for a criminal complaint and corresponding arrest warrants charging ROD R. BLAGOJEVICH ("ROD BLAGOJEVICH") and JOHN HARRIS with:

a.     conspiring with each other and with others to devise and participate in a scheme to defraud the State of Illinois and the people of the State of Illinois of the honest services of ROD BLAGOJEVICH and JOHN HARRIS, in furtherance of which the mails and interstate wire communications would be used, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346; all in violation of Title 18, United States Code, Section 1349; and

b.     being agents of the State of Illinois, a State government which during a one-year period, beginning January 1, 2008 and continuing to the present, received federal benefits in excess of $10,000, corruptly soliciting and demanding a thing of value, namely, the firing of certain Chicago Tribune editorial members responsible for widely-circulated editorials critical of ROD BLAGOJEVICH, intending to be influenced and rewarded in connection with business and transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the provision of millions of dollars in financial assistance by the State of Illinois, including through the Illinois Finance Authority, an agency of the State of

Illinois, to the Tribune Company involving the Wrigley Field baseball stadium; in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

4.     Defendant ROD BLAGOJEVICH is the Governor of the State of Illinois. He was elected Governor in 2002 and was reelected Governor in 2006.

5.     Defendant JOHN HARRIS is employed by the State of Illinois as the chief of staff to the Governor, ROD BLAGOJEVICH.

6.     As officials of the State of Illinois, ROD BLAGOJEVICH and JOHN HARRIS each owe a duty of honest services to the State of Illinois and the people of the State of Illinois in the performance of their public duties.

7.     Pursuant to Article VIII, Section 1(a) of the Constitution of the State of Illinois, public funds, property and credit shall be used only for public purposes.

8.     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-3(c) and (d)), ROD BLAGOJEVICH and JOHN HARRIS each are prohibited from committing the following acts in his official capacity: (1) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; and (2) soliciting or knowingly accepting, for the performance of any act, a fee or reward which he knows is not authorized by law.

9.     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-1(d)), ROD BLAGOJEVICH is prohibited from receiving, retaining, or agreeing to accept any property or personal advantage which he is not authorized by law to accept, knowing that

3

such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of his public office.

10.     Friends of Blagojevich is a private entity organized and existing under the laws of the State of Illinois as a state-wide political campaign committee established on behalf of ROD BLAGOJEVICH to support his campaign efforts.

11.     The Illinois Finance Authority ("IFA") is a body politic and corporate created by Illinois law (20 ILCS 3501 *et seq.*), one of the statutory purposes of which is to "to accomplish and to carry out these policies of the State which are in the public interest of the State and of its taxpayers and residents." Pursuant to Illinois law, the members of the IFA are appointed by the Governor of the State of Illinois and may be removed by the Governor for cause. The IFA is authorized by statute to accept state and federal funds for use in connection with the IFA's purposes, and its operations are subject to audit by the Illinois Auditor General. Pursuant to Title 74 of the Illinois Administrative Code, Part 1100.250, "[t]he Governor of the State serves as the applicable elected representative [of the IFA] for purposes of the public approval requirement of the Tax Code." According to a web site maintained by the Illinois State Comptroller, the IFA received at least $493,750 in 2008 in earmarked loan funds from the State of Illinois. In 2008, the State of Illinois received over $10,000 in federal benefits.

12.     Because this affidavit is submitted for the limited purpose of securing a criminal complaint and corresponding arrest warrants, I have not included each and every fact known to me concerning this investigation.

## II.    SUMMARY OF PROBABLE CAUSE

13.     Since approximately 2003, the government has been investigating allegations of illegal activity occurring in State of Illinois government as part of the administration of Governor ROD BLAGOJEVICH. As further detailed below, the investigation has developed evidence that: (a) beginning not later than in or about 2002, ROD BLAGOJEVICH has conspired with multiple individuals, including, beginning not later than in or about October 2008, JOHN HARRIS, to devise and participate in a scheme, which used and contemplated the use of the mails and interstate wire communications, to defraud the State of Illinois and its residents of the honest services of ROD BLAGOJEVICH and JOHN HARRIS by corruptly using the office of Governor of the State of Illinois to obtain and attempt to obtain personal gain, including financial gain, for ROD BLAGOJEVICH and third parties with whom he is associated; and (b) beginning no later than November 2008, ROD BLAGOJEVICH and JOHN HARRIS have corruptly solicited and demanded the firing of Chicago Tribune editorial board members responsible for editorials critical of ROD BLAGOJEVICH, intending to be influenced and rewarded in connection with State of Illinois financial assistance in connection with the sale of Wrigley Field. The evidence

5

demonstrates that the corrupt conduct undertaken included but was not limited to the following:

a.     Defendant ROD BLAGOJEVICH and at times defendant JOHN HARRIS, together with others, obtained and attempted to obtain financial benefits for ROD BLAGOJEVICH, members of the Blagojevich family, and third parties including Friends of Blagojevich, in exchange for appointments to state boards and commissions, state employment, state contracts, and access to state funds;

b.     Defendants ROD BLAGOJEVICH and JOHN HARRIS, together with others, offered to, and threatened to withhold from, the Tribune Company substantial state financial assistance in connection with Wrigley Field, which assistance ROD BLAGOJEVICH believed to be worth at least $100 million to the Tribune Company, for the private purpose of inducing the controlling shareholder of the Tribune Company to fire members of the editorial board of the Chicago Tribune, a newspaper owned by the Tribune Company, who were responsible for editorials critical of ROD BLAGOJEVICH;

c.     Defendants ROD BLAGOJEVICH and JOHN HARRIS, together with others, attempted to use ROD BLAGOJEVICH's authority to appoint a United States Senator for the purpose of obtaining personal benefits for ROD BLAGOJEVICH, including, among other things, appointment as Secretary of Health & Human Services in the President-elect's administration, and alternatively, a lucrative job which they schemed to induce a union to provide to ROD BLAGOJEVICH in exchange for appointing as senator an individual whom

6

ROD BLAGOJEVICH and JOHN HARRIS believed to be favored by union officials and their associates.

14.     As detailed below, in early October 2008, the government obtained information that ROD BLAGOJEVICH was accelerating his corrupt fund raising activities to accumulate as much money as possible before the implementation of ethics legislation on January 1, 2009, that would severely curtail ROD BLAGOJEVICH's ability to raise money from individuals and entities conducting business with the State of Illinois. Based in part on the recently obtained information, and as part of the investigation into ROD BLAGOJEVICH's corrupt fund raising efforts, in October 2008 the government obtained court approval to intercept oral communications in certain locations in the offices of Friends of Blagojevich. In addition, as part of its investigation, the government obtained court approval to intercept wire communications on the home phone of ROD BLAGOJEVICH.[1]  Specifically:

a.     On October 21, 2008, Chief Judge James F. Holderman signed an order authorizing the interception of oral communications for a 30-day period in two rooms at the Friends of Blagojevich office: the personal office of ROD BLAGOJEVICH and the conference room. On the morning of October 22, 2008, the FBI began intercepting oral communications in those rooms. On November 19, 2008, Chief Judge James F. Holderman

---

[1] Minimization procedures were implemented during the interception of conversations at the Friends of Blagojevich offices and over phones. At times, these minimization procedures were stricter than required under law so as to avoid intercepting certain potentially privileged conversations.

signed an order authorizing the continued interception of oral communications in the two rooms at the Friends of Blagojevich office for a second 30-day period.

b.     On October 29, 2008, Chief Judge James Holderman entered an Order authorizing the interception of wire communications to and from a landline telephone subscribed to ROD BLAGOJEVICH's home address and used by ROD BLAGOJEVICH and others. The interception of wire communications to and from ROD BLAGOJEVICH's home phone began on the evening of October 29, 2008. On November 26, 2008, Acting Chief Judge Matthew F. Kennelly signed an order authorizing the continued interception of wire communications on ROD BLAGOJEVICH's home phone for a second 30-day period.

15.     The remainder of this affidavit first sets out certain information obtained prior to the initiation of the court-authorized interceptions, relating to allegations that ROD BLAGOJEVICH solicited and obtained campaign contributions in exchange for official actions as Governor. Next, this affidavit details certain information obtained during the course of the court-authorized interceptions and relating to the crimes alleged in the attached criminal complaint. This information, in turn, is divided into sections relating to three topics: (a) efforts to obtain campaign contributions in exchange for official actions by ROD BLAGOJEVICH; (b) efforts to use state funds for the private purpose of inducing the Tribune Company to fire Chicago Tribune editorial board members critical of ROD BLAGOJEVICH by making their firing a condition of state assistance to the Tribune

8

Company in connection with Wrigley Field; and (c) efforts to obtain personal financial benefits for ROD BLAGOJEVICH in return for his appointment of a United States Senator.

## III.   FACTS ESTABLISHING PROBABLE CAUSE

### A.   Evidence Concerning the Solicitation and Receipt of Campaign Contributions in Return for Official Acts by ROD BLAGOJEVICH Prior to October 2008

#### 1.   Information Provided by Ali Ata

16.     As described in more detail in the following paragraphs, Ali Ata testified under oath in the spring of 2008 that Ata discussed with ROD BLAGOJEVICH a potential appointment to a high-level position with the State of Illinois while a $25,000 donation check to Friends of Blagojevich from Ata was sitting on a table in front of ROD BLAGOJEVICH. Ata further testified that later, after Ata made another substantial contribution to Friends of Blagojevich, ROD BLAGOJEVICH told Ata that he was aware of the donation, that he understood that Ata would be joining his administration, and that Ata better get a job "where [Ata] can make some money."

17.     Ata is a businessman who, in May 2008, as part of a cooperation agreement with the government, pled guilty to making false statements to the FBI and to tax fraud.[2] Pursuant to his cooperation agreement, the government has interviewed Ata extensively

---

[2] Under the terms of the plea agreement, if Ata continues to completely and truthfully cooperate, the government will make a motion pursuant to 5K1.1 for a reduction from his 12-18 month applicable guideline range. The plea agreement allows his counsel to ask for any sentence, including probation. Other than his felony convictions in May 2008, Ata has no criminal history.

regarding a number of topics, including his knowledge of and involvement in fundraising for ROD BLAGOJEVICH. In addition, Ata testified under oath at the criminal trial of Antoin Rezko (the "Rezko Trial") in May 2008.[3] Portions of Ata's testimony are directly relevant to the current investigation. In summary, and in relevant part, Ata testified as follows during the Rezko Trial:

18.    In or about 2000 or 2001, at a meeting with Ata, ROD BLAGOJEVICH who at the time was a member of the United States House of Representatives, told Ata that he was contemplating a run for higher office and asked for Ata's support. Ata agreed to support him. Thereafter, Ata observed that Rezko was close to ROD BLAGOJEVICH and was very involved in fund raising for ROD BLAGOJEVICH's campaign, including overseeing Ata's own fund raising efforts on behalf of ROD BLAGOJEVICH.

19.    In or about 2002, Ata had several conversations with Rezko regarding the possibility of a high level appointment for Ata in state government should ROD BLAGOJEVICH be elected. At Rezko's direction, Ata put together a list of three state agencies to which he would be interested in being appointed, including the Capital Development Board.

---

[3] Rezko was a principal fundraiser for ROD BLAGOJEVICH. His criminal trial focused on allegations that Rezko and Stuart Levine, a member of the board of trustees of the Teachers Retirement System and the Illinois Health Facilities Planning Board, engaged in a scheme to defraud the State of Illinois of Levine's honest services by demanding kickbacks, as well as political contributions to the campaign of ROD BLAGOJEVICH, in return for the exercise of Levine's official influence. Relevant evidence presented at the Rezko trial is summarized below.

20.     In or about August 2002, Ata held a small fund raising event for ROD BLAGOJEVICH that ROD BLAGOJEVICH attended. In advance of that fund raising event, Ata committed to Rezko that Ata would raise $25,000 at that event, which he eventually did, personally contributing at least approximately $5,000.

21.     Later that year, Rezko approached Ata for additional monetary support for ROD BLAGOJEVICH. Ata agreed to contribute $25,000 in additional monies to the campaign of ROD BLAGOJEVICH. Ata, subsequently and by prior arrangement with Rezko, brought a check in this amount to Rezko's offices on Elston Avenue in Chicago. After he arrived at Rezko's offices, Ata was greeted by Rezko to whom he handed the check in an envelope. Rezko, carrying the check, ushered Ata into a conference room where he met with Rezko and ROD BLAGOJEVICH. Rezko placed the envelope containing Ata's $25,000 check to ROD BLAGOJEVICH's campaign on the conference room table between himself and ROD BLAGOJEVICH and stated to ROD BLAGOJEVICH that Ata had been a good supporter and a team player and that Ata would be willing to join ROD BLAGOJEVICH's administration. ROD BLAGOJEVICH expressed his pleasure and acknowledged that Ata had been a good supporter and good friend. ROD BLAGOJEVICH, in Ata's presence, asked Rezko if he (Rezko) had talked to Ata about positions in the administration, and Rezko responded that he had.[4]

---

[4] Rezko, whose reliability has yet to be fully determined, has confirmed to the government in proffer sessions the essence of Ata's testimony regarding Ata's meeting with ROD BLAGOJEVICH, but has a different recollection regarding the timing and chronology
(continued...)

11

22.     After this meeting, Ata completed an application for a state appointment. In or about early 2003, Rezko informed Ata that he was going to be appointed to head the state Capital Development Board. Rezko subsequently informed Ata that this position was going to someone else and that another position would have to be found for Ata. Later, Rezko discussed an opportunity for Ata with the newly formed Illinois Finance Authority ("IFA").

23.     In or about July 2003, Rezko asked Ata to make an additional $50,000 contribution to the campaign of ROD BLAGOJEVICH. Ata agreed to contribute the same amount as he had previously, namely $25,000. Ata made this contribution on or about July 25, 2003, by check payable to ROD BLAGOJEVICH's campaign. Ata gave this check to Rezko. Thereafter, Ata had a conversation with ROD BLAGOJEVICH at a large fund raising event at Navy Pier. During this conversation, ROD BLAGOJEVICH told Ata that Ata had been a good supporter, indicated that ROD BLAGOJEVICH was aware that Ata had

---

[4](...continued)

of certain events and only recalls asking Ata for one $25,000 check for ROD BLAGOJEVICH. Rezko's proffers have been substantial but are not complete and the government's efforts to fact check and corroborate Rezko's proffered information are not yet complete. Rezko has proffered with the government in hopes of receiving a recommendation from the government for a reduced sentence. During the proffer sessions, Rezko at times has provided accounts that differ from those of other witnesses, including Ata, but in broad terms Rezko's account incriminates ROD BLAGOJEVICH in a "pay to play" criminal scheme. Because the government is not yet satisfied that Rezko's accounts are full and complete, the government is not relying on Rezko's account for probable cause. The government simply notes that while Rezko's account varies at times from those of other witnesses, Rezko's account of ROD BLAGOJEVICH's activity, on balance, would add to the probable cause set forth herein, not subtract. Where Rezko's proffered recollection differs significantly from those of witnesses upon whose testimony the government is relying, this affidavit notes those differences.

made another substantial donation to ROD BLAGOJEVICH's campaign, and told Ata that he understood that Ata would be joining his administration. Ata responded that he was considering taking a position, and ROD BLAGOJEVICH stated that it had better be a job where Ata could make some money.

24.     Ata was surprised by this comment by ROD BLAGOJEVICH and said something to Rezko about it the next time Ata saw Rezko. When Ata told Rezko that ROD BLAGOJEVICH had said words to the effect of, "it had better be a job where you can make some money," Rezko responded that he was not surprised and had heard ROD BLAGOJEVICH say things like that before.

### 2.     Information Provided by Joseph Cari

25.     As described in further detail in the following paragraphs, Joseph Cari testified under oath at the Rezko Trial on April 15 and 16, 2008.[5] Among other things, Cari testified that he had a conversation with ROD BLAGOJEVICH in which ROD BLAGOJEVICH informed Cari that ROD BLAGOJEVICH could use his power to award State of Illinois contracts in order to generate campaign contributions. Cari further testified that he had

---

[5] Cari testified pursuant to his obligations under a written plea agreement entered into with the government. In the plea agreement, Cari pled guilty to the attempted extortion of JER, an investment company attempting to obtain a State of Illinois investment. In exchange for his truthful cooperation, the government agreed to recommend at the time of Cari's sentencing that Cari receive a sentence of two and a half years in prison. The plea agreement allows his counsel to ask for any sentence, including probation. Prior to pleading guilty to attempted extortion, Cari had no criminal history.

similar conversations with Rezko and Chris Kelly[6], who specifically offered him State of Illinois work in exchange for Cari's assistance with various fundraising matters. In summary, and in relevant part, Cari testified as follows during the Rezko Trial:

26. Cari was a significant fundraiser for Democratic causes and was previously the national finance chair for Vice President Al Gore's 2000 presidential campaign. During his testimony, Cari described meetings that he had with ROD BLAGOJEVICH, Chris Kelly, Rezko, and Stuart Levine[7]. In particular, on approximately October 29, 2003, Cari, ROD BLAGOJEVICH, Kelly, Levine and others rode on an airplane arranged by Levine to a fundraiser in New York being hosted by Cari on behalf of ROD BLAGOJEVICH. During the plane ride, Cari had a conversation with ROD BLAGOJEVICH. During the conversation, Cari and ROD BLAGOJEVICH discussed Cari's fundraising background and work as a national fundraiser. ROD BLAGOJEVICH discussed his interest in running for President of the United States. During the conversation, ROD BLAGOJEVICH informed Cari that it was easier for governors to solicit campaign contributions because governors had the ability to "award contracts" and give legal work, consulting work, and investment banking work to campaign contributors. ROD BLAGOJEVICH informed Cari that Rezko and Kelly were his point people in raising campaign contributions. Later in the conversation,

---

[6] Like Rezko, Kelly was a principal campaign fundraiser for ROD BLAGOJEVICH.

[7] Stuart Levine was a Chicago-area businessman and an associate of Rezko and Kelly who served on the Illinois Health Facilities Planning Board and the board of trustees of the Teachers Retirement System of Illinois. Further information about Levine is provided below at paragraph 31 *et seq.*

ROD BLAGOJEVICH told Cari that there were State of Illinois contracts and other State of

Illinois work that could be given to contributors who helped ROD BLAGOJEVICH, Rezko,

and Kelly. Cari testified that ROD BLAGOJEVICH ended the conversation with Cari by

informing Cari that Rezko and Kelly would follow up with Cari in relation to the discussion

that had just occurred.

27.     At one point during the October 29, 2003 New York fundraiser, Cari and

Levine had a conversation. Cari testified that during the conversation, Levine informed Cari

that there was a plan in place in the Blagojevich administration pursuant to which Rezko and

Kelly would pick consultants to do business with State of Illinois boards, and thereafter, the

consultants would be asked to make campaign contributions.

28.     Cari also testified about a conversation he had with Rezko at Rezko's office.

Levine was also present for the conversation. According to Cari, Rezko informed Cari that

Rezko had a close relationship with the Blagojevich administration and Rezko had a role in

picking consultants and law firms and other entities to get State of Illinois business. Rezko

informed Cari that Rezko called ROD BLAGOJEVICH's chief of staff, Lon Monk, and

Monk would help implement Rezko's choices for certain State of Illinois work. Rezko

informed Cari that, in exchange for raising money for ROD BLAGOJEVICH, the

Blagojevich administration would be financially helpful to Cari's business interests.

29.     On approximately March 5, 2004, Cari met with Kelly at a restaurant. Cari

testified that Kelly stated that Kelly was following up on Cari's conversations with ROD

BLAGOJEVICH, Rezko, and Levine. Kelly then requested Cari's help in raising money on a national level for ROD BLAGOJEVICH. Cari, as he had in the past, indicated he was not inclined to assist ROD BLAGOJEVICH. In response, Kelly pushed Cari to assist ROD BLAGOJEVICH and informed Cari that helping ROD BLAGOJEVICH would be good for Cari's business interests and that Cari "could have whatever [Cari] wanted," which Cari understood to be a reference to getting Cari's business interests whatever State of Illinois work Cari wanted if Cari helped raise money on a national level for ROD BLAGOJEVICH. The conversation ended shortly thereafter.

30. Cari testified that he eventually became involved in the attempted extortion of JER, a real estate investment firm that was seeking an investment from the Teachers Retirement System ("TRS"). Details regarding corruption at TRS involving one of its board members, Stuart Levine, are set forth below. Based on his conversations with ROD BLAGOJEVICH, Rezko, Kelly, and Levine, in which he was informed that consultants would be inserted into State of Illinois transactions and then solicited for campaign contributions, Cari believed that JER needed to hire a consultant. Cari testified that he informed employees of JER that they needed to hire a consultant and that in Illinois the "Governor and the people around the Governor" pick the consultants to be used on particular deals. Cari informed JER employees that if they did not hire the consultant then JER would not receive the money it was seeking from the State of Illinois. Ultimately, JER exposed the attempted extortion and received money from the State of Illinois.

### 3. Information Provided by Stuart Levine

31.     In approximately December 2003, the FBI began an investigation of allegations that at least one member of the Illinois Health Facilities Planning Board (the "Planning Board"), Stuart Levine, was soliciting bribes in exchange for board action. At the time, Levine was a businessman who served on two state boards: the board of trustees of TRS, and the Planning Board. As part of the investigation, the government sought and obtained court authorization to record phone calls on multiple phones used by Levine.

32.     On May 4, 2005, Levine was indicted in *United States v. Levine, et al.* 05 CR 408 (Grady, J.) on 28 counts of mail and wire fraud, extortion, bribery, and money laundering. On August 3, 2005, Levine was indicted in *United States v. Levine, et al.*, 05 CR 691 (St. Eve., J.) on 13 counts of mail and wire fraud, bribery, and attempted extortion. On October 27, 2006, Levine pleaded guilty to Counts One and Twenty-Three of a superseding indictment in Case No. 05 CR 691. As part of Levine's plea agreement, the government moved, on November 15, 2006, to dismiss the pending superseding indictment and indictment against Levine in Case No. 05 CR 408.

33.     Pursuant to his cooperation agreement, the government has interviewed Levine extensively regarding a number of topics, including his knowledge of and involvement in the corruption of Illinois state government and fundraising for ROD BLAGOJEVICH. In addition, Levine testified under oath at the Rezko Trial.[8] Portions of Levine's testimony at

---

[8] As noted above, Levine was charged in two separate indictments before pleading
(continued...)

the Rezko trial are directly relevant to the current investigation. The remainder of this section sets forth, in summary, and in relevant part, Levine's testimony at the Rezko Trial, except as noted where information is specifically identified as having been obtained from other sources:

### a.  Levine's Plane Ride with Blagojevich

34.  According to Levine, in approximately late October 2003, after Levine was reappointed to the Planning Board, he shared a private plane ride from New York to Chicago with ROD BLAGOJEVICH and Kelly. Levine, ROD BLAGOJEVICH, and Kelly were the only passengers on the flight. According to Levine, at the beginning of the flight, Levine thanked ROD BLAGOJEVICH for reappointing him to the Planning Board. ROD

---

[8](...continued)
guilty in Case No. 05 CR 691. In Levine's plea agreement, Levine acknowledged that under the Sentencing Guidelines he was facing a guidelines range of life imprisonment. As a result of Levine's plea, the government will recommend, assuming Levine's continued complete and truthful cooperation, that Levine be sentenced to a term of 67 months' imprisonment. In Levine's plea agreement, Levine admitted to violating his duty of honest services to two separate Illinois state boards by seeking and agreeing to accept kickbacks and payments worth millions of dollars in exchange for using Levine's influence and position on the state boards to benefit numerous third parties. Levine further admitted in his plea agreement to defrauding a medical school and a charitable organization which he controlled out of additional millions of dollars. In addition to the crimes detailed in his plea agreement, Levine committed additional crimes over the past approximately 20 years, including instances of paying bribes, tax fraud, election fraud, structuring, and defrauding the estate of a business associate. Levine has further admitted to using illegal narcotic drugs for approximately 30 years up to and including 2004, including the repeated and regular use of cocaine, crystal methamphetamine, ecstasy, and ketamine. Levine's credibility was vigorously challenged by defense counsel during the trial that ultimately led to Rezko's conviction.

BLAGOJEVICH responded that Levine should only talk with "Tony" [Rezko] or [Kelly] about the Planning Board, "but you stick with us and you will do very well for yourself." ROD BLAGOJEVICH said this in front of Kelly. According to Levine, Levine understood from ROD BLAGOJEVICH's manner of speaking and words that ROD BLAGOJEVICH did not want Levine to talk to ROD BLAGOJEVICH directly about anything to do with the boards, but that Levine should talk to Rezko or Kelly. Levine also understood that ROD BLAGOJEVICH meant that Levine could make a lot of money working with ROD BLAGOJEVICH's administration. According to Levine, ROD BLAGOJEVICH did not seem to expect a response from Levine, and Kelly then shifted the conversation to something else.

### b. Corruption of the Planning Board

35. As described more fully in the following paragraphs, Mercy Hospital, which sought permission from the Planning Board to build a hospital in Illinois, received that permission through Rezko's exercise of his influence at the Planning Board after Rezko was promised that Mercy Hospital would make a substantial campaign contribution to ROD BLAGOJEVICH. Rezko later told a member of the Planning Board that Mercy Hospital received the permit because ROD BLAGOJEVICH wanted the organization to receive the permit.

36. Levine's criminal activities included his abuse of his position on the Planning Board to enrich both himself and Friends of Blagojevich. The Planning Board was a

19

commission of the State of Illinois, established by statute, whose members were appointed by the Governor of the State of Illinois. At the relevant time period, the Planning Board consisted of nine individuals. State law required an entity seeking to build a hospital, medical office building, or other medical facility in Illinois to obtain a permit, known as a "Certificate of Need" ("CON"), from the Planning Board prior to beginning construction.

37.    Levine, as well as Planning Board members Thomas Beck and Imad Almanaseer, testified under oath at the Rezko Trial.[9] Beck testified that he asked Rezko to reappoint him to the Planning Board and that Beck thereafter followed Rezko's directions regarding which CON applications Rezko wanted approved. Beck testified that it was his job to communicate Rezko's interest in particular CONs to other members of the Planning Board, including Almanaseer, who were loyal to Rezko. Beck testified that he understood that Rezko spoke for the Blagojevich administration when Rezko spoke to Beck about particular CONs. Almanaseer testified that Beck instructed him that Rezko wanted Almanaseer to vote a particular way and that Almanaseer should follow Levine's lead in voting on CONs. Almanaseer testified that before certain Planning Board meetings, he received notecards from Beck indicating how to vote on certain CON applications. Beck testified he provided these notecards to Almanaseer and certain other members of the Planning Board to communicate Rezko's directions about certain CON applications.

---

[9] Beck and Almanaseer testified pursuant to immunity orders.

38.     During his testimony, Levine described a plan to manipulate the Planning Board to enrich himself and Friends of Blagojevich.  The plan centered on an entity commonly known as Mercy Hospital ("Mercy") that was attempting to obtain a CON to build a new hospital in Illinois.  Levine knew the contractor hired to help build the hospital.  In approximately November 2003, on behalf of the contractor, Levine checked with Rezko to determine whether Rezko wanted Mercy to obtain its CON.  Rezko informed Levine that Mercy was not going to receive its CON.  According to Levine, he asked Rezko whether it would matter to Rezko if Mercy's construction contractor paid a bribe to Rezko and Levine and, in addition, made a contribution to ROD BLAGOJEVICH.  Levine testified that Rezko indicated that such an arrangement would change his view on the Mercy CON.[10]

39.     Levine's testimony regarding Rezko's actions to change the Planning Board decision concerning Mercy's application for a CON based on contributions for ROD BLAGOJEVICH is confirmed by attorney Steven Loren.  Loren testified at Rezko's criminal trial and, before that, in the grand jury.[11]  According to Loren, in approximately December 2003, Levine informed Loren that Rezko was against the Mercy CON.  According to Loren,

---

[10]    Rezko has admitted that he manipulated the Mercy vote based on Mercy's agreement to make a contribution to ROD BLAGOJEVICH, which agreement he states was communicated to ROD BLAGOJEVICH, but denies that Levine offered a personal bribe to Rezko as well.

[11]    In connection with this investigation, Steven Loren pled guilty to interfering with the due administration of the Internal Revenue Service.  In exchange for his continued and truthful cooperation, the government has agreed to move the Court for a 5K1.1 departure and his counsel is free to seek any sentence, including probation.  Loren has no other criminal history.  Pursuant to his cooperation agreement, Loren testified at the Rezko Trial.

21

Levine relayed to Loren a conversation between Rezko and Levine during which Levine asked Rezko whether a political contribution to ROD BLAGOJEVICH would make a difference for Mercy's CON, and Rezko responded to Levine that such a contribution might make a difference.

40.     Thereafter, and confirmed by the testimony of Levine, Beck, and Almanaseer, as well as recorded conversations, Rezko switched his directions to Beck and informed Beck that Mercy was to receive its CON. According to Almanaseer, although he previously had been told by Beck that Rezko did not want Mercy to receive its CON, he was later told that there had been a change and that Rezko now wanted Mercy to receive its CON.

41.     Mercy received its CON as a result of a controversial and irregular vote at a public Planning Board meeting.[12] The vote brought significant publicity to the Planning Board and ultimately led to the disbanding of the Planning Board. Almanaseer testified under oath in the grand jury that not long after the Planning Board vote on Mercy's CON he saw Rezko at a fundraiser. According to Almanaseer, he was still embarrassed about what had occurred at the Planning Board vote on Mercy's CON and Rezko's role in the vote. Almanaseer testified that he asked Rezko why Rezko had switched the vote on the Mercy CON. According to Almanaseer, Rezko stated: "The Governor wanted it to pass."

_____

[12] There was extensive testimony regarding the irregularity of the vote at the Planning Board meeting. In summary, during the vote, Levine got up from his seat and went to speak to Beck and to Almanaseer. After these discussions, Almanaseer then changed his vote to be in favor of Mercy receiving its CON. Beck then voted in favor as well and by a vote of 5 to 4, Mercy's application for a CON passed.

Almanaseer understood the reference to "Governor" to be a reference to ROD BLAGOJEVICH.

### c.    History of Control at TRS

42.    In addition to serving on the Planning Board, Levine was a member of the TRS board of trustees. TRS is a public pension plan created by Illinois law for the purpose of providing pension, survivor, and disability benefits for teachers and administrators employed in Illinois public schools except in the City of Chicago. TRS manages over $30 billion in assets on behalf of those individuals and the State of Illinois. The TRS Board of Trustees, with assistance from TRS staff, votes on how to invest these assets.

43.    Levine originally was appointed to the TRS Board in 2000. By the summer of 2001, Levine, working in concert with William Cellini, who had a significant interest in a real estate asset management firm that had a long-standing business relationship with TRS, had established effective control over the TRS board by forming and maintaining a group of TRS trustees who consistently voted together on matters important to Cellini and Levine. Levine testified at the Rezko Trial that he and Cellini were both powerful, long-standing Republican operatives in the state of Illinois. ROD BLAGOJEVICH was the first Democratic governor in the State of Illinois in over 20 years. Because of this, according to Levine, Cellini and Levine had to take certain steps to ingratiate themselves with the new Democratic administration.

44.    Levine testified that among the steps Cellini took to ingratiate himself with

ROD BLAGOJEVICH was raising considerable money for ROD BLAGOJEVICH. Kelly Glynn worked for Friends of Blagojevich from approximately May 2002 to August 2004 as the organization's Finance Director. Glynn testified under oath at the Rezko Trial and has been interviewed by the government. Among other things, Glynn testified that she was familiar with how Friends of Blagojevich tracked fundraising events and credited money brought into Friends of Blagojevich. Glynn testified that a computer database was set up to track donations to Friends of Blagojevich and the individuals responsible for obtaining those donations. In particular, Glynn testified about a fundraising event that occurred in approximately October 2002. Glynn testified that the event was organized and held by Cellini with the attendees being primarily members of the Illinois Road and Transportation Builders Association. Based on instructions from Chris Kelly, however, the Cellini event was not tracked as a Cellini event in the Friends of Blagojevich database but, rather, was listed as a Roadbuilders event in combination with, among others, Rezko.

### d. The Accommodation with Rezko and Kelly

45. As set forth more fully in the following paragraphs, Levine and Cellini, in order to keep their control over TRS, agreed to an accommodation with Rezko and Kelly that Rezko and Kelly would use their influence with ROD BLAGOJEVICH to stop the consolidation of TRS with other pension boards and, in exchange, Levine and Cellini would assist investment firms named by Rezko and Kelly to receive TRS money because those investment firms had made or would make political contributions to ROD BLAGOJEVICH.

46.     In approximately the spring of 2003, a threat arose towards Levine's and Cellini's control over the TRS Board.   At that time, there were indications that the Blagojevich administration would seek legislation consolidating TRS with two other Illinois state pension boards.

47.     Levine and Cellini were opposed to the proposal to consolidate the pension boards because it might cause them to lose their control at TRS.  According to Levine, in the spring of 2003, Cellini told Levine that Cellini would talk to Rezko and Kelly about trying to stop the pension consolidation plan. Cellini later told Levine that he had spoken with Rezko and Kelly, and offered an accommodation to them.  According to Levine, in exchange for Rezko's and Kelly's help in stopping the consolidation proposal, Cellini said that Cellini and Levine would use their influence on the TRS Board to help investment firms that Rezko or Kelly recommended receive investments from TRS.  Cellini said that Rezko and Kelly agreed to the arrangement.  Levine understood from Cellini's description that Rezko and Kelly would ask Levine and Cellini to help investment firms receive TRS money because those investment firms had made or would make political contributions to ROD BLAGOJEVICH.[13]

---

[13] Rezko has informed the government that Cellini raised the issue of pension board consolidation with Rezko and Chris Kelly and that Cellini was against the pension board consolidation. Rezko has stated he is unaware if Kelly took any action regarding the pension consolidation and that he did not personally take any action in relation to the pension board consolidation.  Rezko has stated he did not consider using TRS to solicit campaign contributions.

48. Levine's testimony regarding the accommodation was corroborated by a recorded call on April 12, 2004, in which Levine informed another individual: "You know I sat down talked [to Cellini] a long time ago I said if you can convince those guys [Rezko and Kelly] to let us stay in place. . . We got a great machinery and if there's an accommodation you know we'll certainly try to accommodate but if they just wanna stick things in you know I'm gonna leave that's no way to do that."

49. According to Levine, Cellini told Levine that Rezko had informed Cellini that Rezko and Kelly had met with ROD BLAGOJEVICH and other senior Illinois state officials regarding the proposal to consolidate TRS and two other pension boards. According to Levine, Cellini said that Rezko related that ROD BLAGOJEVICH was skeptical as to why he should take the advice of Kelly over a senior state official on this topic. According to Levine, Rezko asked Cellini, who asked Levine, to get some talking points as to why the consolidation idea was a bad one. Levine ultimately obtained talking points from Steve Loren, TRS's outside counsel.

50. Ultimately, the proposal to consolidate the state pension boards was not advanced in the Spring 2003 legislative session. According to Levine, Levine told Loren that Kelly and Rezko had assured him that the administration was going to leave TRS alone. According to Levine, around that time, Levine and Rezko agreed that there would be times that Rezko or ROD BLAGOJEVICH needed to repay political contributors by helping those people get investments from TRS. According to Loren, Levine told Loren that in exchange

for Rezko and Kelly's support on the pension issue, Levine had agreed with Rezko and Kelly that from time to time Rezko and Kelly would be allowed to direct the payment of placement fees in TRS transactions. Loren understood this to mean that Rezko and Kelly would use these placement fees as an incentive or reward to those who contributed to ROD BLAGOJEVICH. Loren further understood that Rezko and Kelly would be able to steer free money to the people whom they selected, and those people would get money without providing any services in relation to TRS transactions.

51.     According to Levine, there were occasions when Rezko or Kelly provided names of funds or individuals to Levine. According to Levine, Levine brought those funds or individuals to the attention of TRS staff and otherwise tried to help those funds or individuals obtain TRS business. There were times, however, where Levine was unable to arrange for TRS to invest in an entity suggested by Rezko or Kelly because the recommendations did not meet the basic TRS investment criteria (e.g., TRS did not invest in hedge funds at that time, so if Rezko or Kelly recommended a hedge fund, Levine could not help that entity).

### 4.     BLAGOJEVICH's knowledge of the Attempted Extortion of Capri Capital

52.     As described in more detail in the following paragraphs, when an attempt by Rezko, Levine, and others to extort a company doing business with the State of Illinois by withholding $220 million in State of Illinois funds until the company made a substantial campaign contribution to ROD BLAGOJEVICH failed, Rezko checked with ROD

27

BLAGOJEVICH before Rezko and others agreed that the company would not again receive State of Illinois funds after it received the $220 million.

53.     Capri Capital ("Capri") was a real estate investment management firm that had a long-standing relationship with TRS. In February 2004, Capri was expected to receive $220 million from TRS to manage. Levine originally acted to stall the allocation in February 2004. Eventually, however, the $220 million allocation was going to proceed until Levine, Rezko, Kelly, and Cellini conspired to extort Capri and Thomas Rosenberg, one of Capri's owners. In short, according to Levine, Levine and Rezko agreed that if Rosenberg wanted to get the $220 million for Capri, Rosenberg was either going to have to make a $1.5 million donation to ROD BLAGOJEVICH or pay Levine and Rezko a 1% fee.[14] According to Levine, and as confirmed on recorded conversations, both Kelly and Cellini joined the attempted extortion and played roles in the attempted extortion. As part of the extortion, Cellini informed Rosenberg that, in essence, Capri had not gotten its $220 million allocation because Rosenberg and Capri had not donated to ROD BLAGOJEVICH. Rosenberg, realizing he was being extorted, threatened to expose the extortion to law enforcement. Thereafter, Levine, Rezko, Kelly, and Cellini backed off the extortionate threats, but agreed that after the $220 million allocation, neither Capri nor Rosenberg would get any further State of Illinois business.

---

[14]  According to Rezko, he recalls agreeing that Rosenberg would have to make a campaign contribution to ROD BLAGOJEVICH, but is not sure whether a finder's fee was discussed.

54.     Numerous conversations related to the extortion were captured on the court-authorized wiretaps on Levine's phones.  In particular, on a recorded May 1, 2004 conversation, Levine spoke with Dr. Robert Weinstein, a co-schemer in Levine's criminal activities.  During the call, Levine told Weinstein about his more recent meeting with Rezko and Kelly.  Levine described how Rezko said that Rosenberg would "have a choice. . . . you can raise a million and a half dollars for the fund raiser in June [for ROD BLAGOJEVICH] . . . or you can work out somethin' with [a consultant to pay a finder's fee]."  During other conversations, Levine and Cellini discussed Rosenberg's reaction to learning that Rezko and Kelly were stalling Capri's $220 million allocation and that if Rosenberg did not want to deal with Rezko in terms of paying money, then Rosenberg could walk away from the $220 million allocation.

55.     On May 8, 2004, Cellini and Levine had a recorded phone conversation after Rosenberg threatened to inform law enforcement about the attempted extortion of Capri for a campaign contribution for ROD BLAGOJEVICH.  During the conversation, Cellini told Levine about how Rezko and Kelly had been "essentially hammerin' people for contracts uh, with with contracts for fundraising [Rezko and Kelly had been forcing individuals to make political contributions in order to win State of Illinois contracts]," how Cellini was a "nervous wreck" about it, and how Cellini and Levine needed to talk with Rezko and Kelly about Rosenberg's threats.

56.     According to Levine, and as confirmed on the recorded conversations, several

29

days later, Levine, Kelly, Rezko, and Cellini met (Cellini participated by phone). After discussing Rosenberg's threats, Rezko suggested that Rosenberg be given his $220 million allocation but never get further business from the State of Illinois. Kelly, however, still wanted to withhold the $220 million allocation.

57.     On May 12, 2004, in a recorded conversation, Levine and Cellini discussed their meeting with Rezko and Kelly. In addition, Levine told Cellini about another conversation he had with Rezko. During Levine's conversation with Rezko, Rezko again advised Levine to solve the Rosenberg problem "with your head, not your heart." Levine noted to Cellini that "[t]he other guy says smack'em over the head," which Levine testified was a reference to Kelly's view that Rosenberg should be given a hard time in relation to the $220 million allocation. Cellini responded by saying, "I think what their position is, or at least Tony's is, okay so he may have to get something here, but he ain't gonna get anything more [Rosenberg would not get any more business from the State of Illinois or TRS]."

58.     Later in the May 12, 2004 recorded call, Cellini asked Levine "did he tell you, too, that the big guy said Rosenberg means nothing to him." Levine testified that he understood Cellini to be stating that Cellini had been told by Rezko that ROD BLAGOJEVICH (the "big guy") was aware of the extortion, that Rosenberg meant nothing to ROD BLAGOJEVICH, and that Cellini was asking if Levine was told something similar about ROD BLAGOJEVICH. Levine responded to Cellini in the affirmative. Levine further testified that he, too, had a conversation with Rezko and Kelly regarding ROD

30

BLAGOJEVICH's knowledge of the extortion. Levine testified that Rezko stated that Rezko had informed ROD BLAGOJEVICH of the extortion situation and that ROD BLAGOJEVICH agreed that the $220 million allocation was the last business Rosenberg would get from the State of Illinois.[15]

### B. Evidence Concerning Corrupt Conduct by ROD BLAGOJEVICH and JOHN HARRIS in and After October 2008

#### 1. Evidence Concerning Efforts to Obtain Campaign Contributions In Exchange for Official Acts

##### a. Information Obtained From Individual A

59. Since October 2008, the FBI has conducted multiple interviews with Individual A, who is an associate of ROD BLAGOJEVICH and has assisted in campaign fundraising for ROD BLAGOJEVICH.[16] Individual A has advised agents that he/she has been present for and participated in multiple conversations with ROD BLAGOJEVICH in recent months regarding campaign fundraising. According to Individual A, ROD BLAGOJEVICH and

---

[15] Rezko has proffered that it was Kelly who informed ROD BLAGOJEVICH about the circumstances of Rosenberg's Capri allocation. As described below, numerous phone conversations have been intercepted in which ROD BLAGOJEVICH engages in ongoing criminal conduct. During certain of these conversations, including those of a clear criminal nature, ROD BLAGOJEVICH denies his involvement in illegal activity, including involvement in illegal activity with Rezko or in relation to the Capri transaction.

[16] Individual A is a subject, but not a target, of the criminal investigation concerning activities at the Illinois Health Facilities Planning Board. Individual A has no criminal history and is not currently providing information to the government as part of any type of cooperation agreement. Individual A's attorney has indicated that Individual A hopes that the government will provide Individual A with immunity in exchange for Individual A's truthful information. Individual A has declined the government's requests to record in-person meetings or telephone conversations with the subjects of the investigation.

Fundrasier A, who is the chairman of Friends of Blagojevich, are making a strong push to raise campaign funds before a new state ethics law goes into effect on January 1, 2009, that will prohibit any individual or entity with existing state contracts of more than $50,000 from contributing to entities like Friends of Blagojevich.

60.     In response to questions posed by agents, Individual A has described efforts by ROD BLAGOJEVICH and Fundrasier A to obtain campaign contributions from state contractors by the end of the year. Specifically, Individual A advised that ROD BLAGOJEVICH is seeking a total of approximately $2.5 million in campaign contributions by the end of the year, principally from or through individuals identified on a list maintained by Friends of Blagojevich. The FBI has obtained a copy of that list, which identifies individuals and entities targeted for campaign contributions, as well as amounts sought from those individuals and entities. A comparison of the names and entities on that list with information available from public sources and FBI investigative files reflects that numerous of the individuals and entities on that list have state contracts or have received public benefits conferred by ROD BLAGOJEVICH, such as appointments to positions in state government.

61.     In response to questions, Individual A has advised agents of incidents involving efforts by ROD BLAGOJEVICH to obtain campaign contributions in connection with his official actions as Governor. Three such incidents are related below.

62.     On October 6, 2008, Individual A and Individual B attended a meeting with ROD BLAGOJEVICH and JOHN HARRIS. Individual B sought the meeting with ROD

BLAGOJEVICH to discuss help ROD BLAGOJEVICH could provide to Individual B's business venture. After Individual B left the meeting, ROD BLAGOJEVICH informed Individual A that ROD BLAGOJEVICH liked Individual B and/or Individual B's project and wanted Individual A to approach Individual B about raising $100,000 for Friends of Blagojevich by the end of the year. According to Individual A, he later learned that ROD BLAGOJEVICH reached out directly to Individual B to ask Individual B to hold a fund raiser for ROD BLAGOJEVICH before the end of the year.

63. According to Individual A, after Individual B left the meeting on October 6, 2008, ROD BLAGOJEVICH told Individual A that he was going to make an upcoming announcement concerning a $1.8 billion project involving the Tollway Authority. ROD BLAGOJEVICH told Individual A that Lobbyist 1 was going to approach Highway Contractor 1 to ask for $500,000 for Friends of Blagojevich. ROD BLAGOJEVICH told Individual A that, "I could have made a larger announcement but wanted to see how they perform by the end of the year. If they don't perform, fuck 'em." According to Individual A, he/she believed that ROD BLAGOJEVICH was telling Individual A that ROD BLAGOJEVICH expected Highway Contractor 1 to raise $500,000 in contributions to Friends of Blagojevich and that ROD BLAGOJEVICH is willing to commit additional state money to the Tollway project but is waiting to see how much money Highway Contractor 1 raises for Friends of Blagojevich.

64. A search of public information available on the internet reflects that Highway Contractor 1 is an officer of a company that is a large supplier of concrete in the state of Illinois. The search also reflected that Highway Contractor 1 is active in one of the largest trade associations, ACPA (American Concrete Pavement Association), in the road building industry in the state of Illinois. In addition, I am aware from public sources that on October 15, 2008, ROD BLAGOJEVICH announced a plan to have new express lanes built on the Illinois Tollway in the next few years at a cost of $1.8 billion.

65. According to Individual A, on October 8, 2008, during a discussion of fundraising from various individuals and entities, the discussion turned to Children's Memorial Hospital, and ROD BLAGOJEVICH told Individual A words to the effect of "I'm going to do $8 million for them. I want to get [Hospital Executive 1] for 50." Individual A understood this to be a reference to a desire to obtain a $50,000 campaign contribution from Hospital Executive 1, the Chief Executive Officer of Children's Memorial Hospital. Individual A said that he/she understood ROD BLAGOJEVICH's reference to $8 million to relate to his recent commitment to obtain for Children's Memorial Hospital $8 million in state funds through some type of pediatric care reimbursement. As described in further detail below, intercepted phone conversations between ROD BLAGOJEVICH and others indicate that ROD BLAGOJEVICH is contemplating rescinding his commitment of state funds to benefit Children's Memorial Hospital because Hospital Executive 1 has not made a recent campaign contribution to ROD BLAGOJEVICH.

34

66.     According to Individual A, during this same meeting, ROD BLAGOJEVICH began discussing recent media reports about the possibility that Antoin "Tony" Rezko was cooperating with the government. According to Individual A, at one point in the conversation, ROD BLAGOJEVICH said words to the effect that he was not concerned about Rezko's cooperation because he was not involved in illegal activity with Rezko. According to the Individual A, Fundraiser A then said words to the effect of, "unless prospectively somebody gets you on a wire."

67.     On October 22, 2008, the FBI intercepted pursuant to a court order portions of a meeting held in a conference room at the Friends of Blagojevich office. The meeting was attended by ROD BLAGOJEVICH, Fundraiser A, and two lobbyists actively involved in fundraising for Friends of Blagojevich. FBI Special Agents have listened to a recording of the meeting. The voices on the recording are very low and at times are difficult to hear. However, based on a review of the recording, FBI Special Agents were able to determine the following:[17]

        (a)     At approximately 10:15 a.m., and consistent with phone records, ROD

---

[17] Voice identifications of the individuals on the oral intercepts or, as described in detail below, on the phones, are preliminary. In most cases, voice identifications are based on names used during the intercepted conversations, as well as voice recognition that has been accomplished to date by FBI monitoring personnel and/or telephone subscriber information. In addition, quoted sections of intercepts or phone calls are based on preliminary analysis of the intercepts or calls and are not final transcripts. For purposes of clarification, I have added interpretations of certain sections of the phone calls within the quoted language by inserting the clarification in parentheses.

BLAGOJEVICH called Highway Contractor 1. Only ROD BLAGOJEVICH's portion of the phone call can be heard. The call started with ROD BLAGOJEVICH saying hello to "Mr. [Highway Contractor 1]" and noting that ROD BLAGOJEVICH was "excited" about the "Tollway" (believed to be a reference to ROD BLAGOJEVICH's recent announcement of $1.8 billion in Illinois Tollway funding that will benefit Highway Contractor 1 and the trade association with which he is affiliated). ROD BLAGOJEVICH talked about speaking with "[Individual C]," (Individual C is a former member of the U.S. House of Representatives who is believed to be attempting to assist ROD BLAGOJEVICH in passing a capital bill worth billions of dollars that would benefit Highway Contractor 1 and the trade association with which he is affiliated) and began, in the context of asking Highway Contractor 1 to do fund raising, to discuss fund raising rule changes that will take effect on January 1, 2009. The conversation ended with ROD BLAGOJEVICH stating to Highway Contractor 1: "Call me if you need anything."

### 2. Information Obtained from Intercepted Phone Conversations Concerning Efforts to Obtain Campaign Contributions In Exchange for Official Acts

68. Certain of the intercepted telephone communications relate to ROD BLAGOJEVICH's efforts to illegally obtain campaign contributions in exchange for official action, in violation of his duty of honest services to the State and people of Illinois. The interceptions to date have corroborated the testimony of witnesses in the Rezko Trial who testified that ROD BLAGOJEVICH was involved in obtaining campaign contributions in

exchange for official action and directly corroborate the information provided by Individual

A that ROD BLAGOJEVICH is engaged in an effort to obtain as many contributions as

possible from persons doing business with the State of Illinois before the end of the year.

Among these communications are the following:

a. On the morning of November 12, 2008, ROD BLAGOJEVICH talked

to Fundraiser A. During the course of the conversation, which principally concerned the

status of campaign fundraising efforts, Fundraiser A told ROD BLAGOJEVICH that

Fundraiser A had never heard from Hospital Executive 1. Fundraiser A said, "I've left three

messages there so I'm gonna quit calling. I feel stupid now." ROD BLAGOJEVICH asked

when the most recent call was, and Fundraiser A replied that it was two days ago. ROD

BLAGOJEVICH said that if "they don't get back to you, then, then, last resort is, I'll call."

b. Later on November 12, 2008, at approximately 2:14 p.m., ROD

BLAGOJEVICH spoke with Deputy Governor A, a Deputy Governor of the State of Illinois.

The following exchange began the conversation:

| | |
|---|---|
| ROD BLAGOJEVICH: | The pediatric doctors – the reimbursement. Has that gone out yet, or is that still on hold?" |
| DEPUTY GOVERNOR A: | The rate increase? |
| ROD BLAGOJEVICH: | Yeah. |
| DEPUTY GOVERNOR A: | It's January 1. |
| ROD BLAGOJEVICH: | And we have total discretion over it? |
| DEPUTY GOVERNOR A: | Yep. |

37

| | |
|---|---|
| ROD BLAGOJEVICH: | We could pull it back if we needed to – budgetary concerns – right? |
| DEPUTY GOVERNOR A: | We sure could. Yep. |
| ROD BLAGOJEVICH: | Ok. That's good to know. |

c.       On November 12, 2008, at approximately 8:26 p.m., Fundraiser A called ROD BLAGOJEVICH and reported the status of fundraising efforts. During the conversation ROD BLAGOJEVICH instructed Fundraiser A to call Lobbyist 1 the following day and ask Lobbyist 1 what to do about the fact that Hospital Executive 1 is not calling Fundraiser A back and inquire whether it was possible that Individual A had instructed Hospital Executive 1 not to call back (*see* Paragraph 65). ROD BLAGOJEVICH asked, "what do we do with this guy, [Hospital Executive 1]?"

d.       On November 13, 2008, at approximately 10:05 a.m., ROD BLAGOJEVICH talked with Fundraiser A. The discussion concerned the status of fundraising efforts. During this call, ROD BLAGOJEVICH asked about Highway Contractor 1. Fundraiser A stated that Lobbyist 1 is still working with Highway Contractor 1. Fundraiser A also advised ROD BLAGOJEVICH that he will be meeting Lobbyist 2 to meet with an individual at Weiss Memorial Hospital. ROD BLAGOJEVICH states: "Yeah, now be real careful there. I mean, the FBI went to see [Lobbyist 2]. You understand?" Fundraiser A also said that he had a call into Individual A and that Fundraiser A will talk to Individual A about Hospital Executive 1.

e. Also during this call, ROD BLAGOJEVICH and Fundraiser A spoke about efforts to raise funds from two other individuals before the end of the year. Fundraiser A advised ROD BLAGOJEVICH that with respect to one of these individuals, Contributor 1,[18] Lobbyist 1 had informed Fundraiser A that Contributor 1 was "good for it" but that Lobbyist 1 was "going to talk with you (ROD BLAGOJEVICH) about some sensitivities legislatively, tonight when he sees you, with regard to timing of all of this." ROD BLAGOJEVICH asked, "Right, before the end of the year though, right?" Fundraiser A responded affirmatively. Later in the conversation, ROD BLAGOJEVICH stated that he knows Lobbyist 1 is "down there (Springfield, Illinois)" with Contributor 1 "pushing a bill." In a series of calls since that time, it became clear that the bill Lobbyist 1 is interested in is in the Office of the Governor awaiting ROD BLAGOJEVICH's signature. The bill, which is believed to be a law which involves directing a percentage of casino revenue to the horse racing industry, is expected to be signed as soon as next week. In a call on December 3, Lobbyist 1 advised ROD BLAGOJEVICH that Lobbyist 1 had a private conversation with Contributor 1 about the contribution ("commitment") Contributor 1 had not yet made and advised Contributor 1 "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment" and made clear that the contribution "got to be in now." ROD BLAGOJEVICH commented to Lobbyist 1 "good"

---

[18] Contributor 1 is listed on the Friends of Blagojevich spreadsheet as someone from whom Friends of Blagojevich was seeking $100,000 in contributions and Lobbyist 1 is listed as one of the contacts for Contributor 1.

and "good job." In a call the next day, Lobbyist 1 asked ROD BLAGOJEVICH to call Contributor 1 "just to say hello, I'm working on the timing of this thing, but it's gonna get done." Lobbyist 1 suggested that it is better for ROD BLAGOJEVICH to make the call personally "from a pressure point of view." ROD BLAGOJEVICH stated that he would call Contributor 1 and indicate that ROD BLAGOJEVICH wanted to do an event (fundraiser) downstate "so we can get together and start picking some dates to do a bill signing." Lobbyist 1 assured ROD BLAGOJEVICH that Contributor 1 would be good for the donation because Lobbyist 1 "got in his face."

      f.     With respect to the second individual discussed during the November 13, 2008 call, ROD BLAGOJEVICH and Fundraiser A discussed "60" (believed to be $60,000) that they have "in hand" from a fundraiser held the prior evening by the president of Engineering Firm 1. According to public records maintained by the State of Illinois, Engineering Firm 1 received in excess of $10 million from the State of Illinois during each of fiscal years 2004 through 2008. Shortly after completing this call, at approximately 10:15 a.m. on November 13, 2008, ROD BLAGOJEVICH spoke by telephone with the president of Engineering Firm 1, and told him, "I want to thank you again for your support and friendship and we are going to do everything we can to get that capital bill." Public source information indicates that ROD BLAGOJEVICH is supporting a bill that would provide billions of dollars for infrastructure and would benefit companies like Engineering Firm 1.

g.     On November 14, 2008, ROD BLAGOJEVICH talked to Fundraiser A. During the conversation Fundraiser A told ROD BLAGOJEVICH that he had spoken with Individual A, and that ROD BLAGOJEVICH needed to call Hospital Executive 1. ROD BLAGOJEVICH said that he would call him.

**3.     Evidence Concerning Efforts to Use ROD BLAGOJEVICH's Influence Over the Expenditure of State Funds for the Private Purpose of Inducing the Firing of Chicago Tribune Editorial Board Members Critical of ROD BLAGOJEVICH**

69.     Intercepted phone calls reflect that ROD BLAGOJEVICH and JOHN HARRIS, together with others, are corruptly using and threatening to use the powers of ROD BLAGOJEVICH's office as Governor of the State of Illinois to exert financial pressure on the owners of the Tribune Company, the parent corporation of the Chicago Tribune newspaper, to fire Chicago Tribune editorial board members who were responsible for editorials sharply critical of ROD BLAGOJEVICH's actions as Governor and, among other things, calling for his impeachment.

70.     Media accounts reflect that Tribune Owner, who acquired effective control of the Tribune Company as a result of a financial transaction in 2007, has sought to sell the Chicago Cubs, currently owned by the Tribune Company, and to use the proceeds of that sale to pay debt associated with his acquisition of the Tribune Company. Media accounts also reflect that final bids for the purchase of the Cubs were due by November 26, 2008; that Tribune Owner needs the proceeds from the sale of the Cubs to pay down debt associated with the Tribune Company acquisition; and that a loan agreement relating to his purchase of

41

the Tribune Company may require Tribune Owner to accelerate payments if he is unable to reduce the debt by specified amounts.

71. Based on a review of intercepted phone calls, it appears that the Tribune Company, in connection with its efforts to sell the Cubs, has explored the possibility of obtaining financial assistance from the Illinois Finance Authority ("IFA") relating to the financing or sale of Wrigley Field.[19] During the course of this investigation, agents have intercepted a series of communications regarding the efforts of ROD BLAGOJEVICH and JOHN HARRIS to corruptly use the power and influence of the Office of the Governor to cause the firing of Chicago Tribune editorial board members as a condition of State of Illinois financial assistance in connection with Wrigley Field. The phone calls reflect that ROD BLAGOJEVICH directed JOHN HARRIS to inform Tribune Owner and an associate of Tribune Owner, Tribune Financial Advisor (Tribune Financial Advisor is believed to be an individual identified in media accounts as a top assistant and financial advisor to Tribune Owner, who played a significant role in Tribune Owner's purchase of the Tribune), that State of Illinois financial assistance for the Tribune Company's sale of Wrigley Field would not be forthcoming unless members of the Chicago Tribune's editorial board were fired. Set out

---

[19] According to its website, the "IFA's role is to support the Governor of Illinois' economic development agenda. IFA is uniquely positioned to provide such support by providing required financing resources for businesses, municipalities and not-profit entities." Further, according to its website the IFA's mission is "to foster economic development to public and private institutions that create and retain jobs and improve the quality of life in Illinois by providing access to capital." The IFA is a State of Illinois authority and the governor of the State of Illinois appoints the members of the IFA Board of Directors.

42

below are summaries of certain of those conversations. This affidavit does not include all calls dealing with the corrupt efforts of ROD BLAGOJEVICH and JOHN HARRIS to misuse their influence over the expenditure of state funds to cause the firing of employees of the Chicago Tribune editorial board.

72. On the evening of November 3, 2008, ROD BLAGOJEVICH talked to Deputy Governor A. ROD BLAGOJEVICH stated that he was concerned about possibly being impeached in the Spring and that the Chicago Tribune will be "driving" the impeachment discussion. ROD BLAGOJEVICH asked Deputy Governor A to check to see if the Tribune has recently "advocate[d]" that he be impeached. In fact, the Chicago Tribune recently had published editorials critical of ROD BLAGOJEVICH.[20]

73. In another call between ROD BLAGOJEVICH and Deputy Governor A that occurred a short time later on November 3, 2008, ROD BLAGOJEVICH and Deputy Governor A discussed an editorial from the Chicago Tribune regarding the endorsement of Michael Madigan and calling for a committee to consider impeaching ROD

---

[20] On September 29, 2008, an editorial in the Chicago Tribune called for the Illinois House of Representatives to investigate whether articles of impeachment are warranted against ROD BLAGOJEVICH. In addition, on October 25, 2008, the Chicago Tribune editorial board issued certain endorsements in state political races. An editorial endorsing Speaker of the Illinois House of Representatives Michael Madigan stated: "House Speaker Michael Madigan resists Gov. Rod Blagojevich's worst impulses. Actually, he resists all of Blagojevich's impulses. Now's the time for Madigan to create a House committee to study if there are valid grounds to impeach the governor." In its separate endorsement of Illinois Representative David Miller, the Tribune wrote that he, "is a quality legislator, well-versed in education, health care and human services issues. (He's also the only dentist in the legislature. Can he extract a governor?)."

BLAGOJEVICH. During the call, ROD BLAGOJEVICH's wife can be heard in the background telling ROD BLAGOJEVICH to tell Deputy Governor A "to hold up that fucking Cubs shit. . . fuck them." ROD BLAGOJEVICH asked Deputy Governor A what he thinks of his wife's idea. Deputy Governor A stated that there is a part of what ROD BLAGOJEVICH's wife said that he "agree[s] with." Deputy Governor A told ROD BLAGOJEVICH that Tribune Owner will say that he does not have anything to do with the editorials, "but I would tell him, look, if you want to get your Cubs thing done get rid of this Tribune." Later, ROD BLAGOJEVICH's wife got on the phone and, during the continuing discussion of the critical Tribune editorials, stated that Tribune Owner can "just fire" the writers because Tribune Owner owns the Tribune. ROD BLAGOJEVICH's wife stated that if Tribune Owner's papers were hurting his business, Tribune Owner would do something about the editorial board. ROD BLAGOJEVICH then got back on the phone. ROD BLAGOJEVICH told Deputy Governor A to put together the articles in the Tribune that are on the topic of removing ROD BLAGOJEVICH from office and they will then have someone, like JOHN HARRIS, go to Tribune Owner and say, "We've got some decisions to make now." ROD BLAGOJEVICH said that "someone should say, 'get rid of those people.'" ROD BLAGOJEVICH said that he thinks that they should put this all together and then have HARRIS or somebody go talk to the Tribune owners and say, "Look, we've got decisions to make now. . . moving this stuff forward (believed to be a reference to the IFA helping with the Cubs sale) . . . someone's gotta go to [Tribune Owner], we want to see him

44

. . it's a political fuckin' operation in there." Deputy Governor A agreed and said that HARRIS needs to be "sensitive" about how he does it. ROD BLAGOJEVICH said there is nothing sensitive about how you do it and that it's "straight forward" and you say "we're doing this stuff for you, we believe this is right for Illinois [and] this is a big deal to [Tribune Owner] financially" but what ROD BLAGOJEVICH is doing to help Tribune Owner is the same type of action that the Tribune is saying should be the basis for ROD BLAGOJEVICH's impeachment. ROD BLAGOJEVICH said Tribune Owner should be told "maybe we can't do this now. Fire those fuckers." Deputy Governor A suggested that ROD BLAGOJEVICH say, "I'm not sure that we can do this anymore because we've been getting a ton of these editorials that say, look, we're going around the legislature, we gotta stop and this is something the legislature hasn't approved. We don't want to go around the legislature anymore." ROD BLAGOJEVICH agreed and said that he wants HARRIS to go in and make that case, "not me." Deputy Governor A agreed and said that he likes it. ROD BLAGOJEVICH asked Deputy Governor A to put the list of Tribune articles together.

74.    During another intercepted call still later on the evening of November 3, 2008, ROD BLAGOJEVICH spoke with Advisor A, a former Deputy Governor under ROD BLAGOJEVICH who is currently a lobbyist. ROD BLAGOJEVICH stated that he is going to go to Tribune Owner and tell Tribune Owner that ROD BLAGOJEVICH will not help Tribune Owner because Tribune Owner's own paper will argue to impeach ROD BLAGOJEVICH for his actions in helping Tribune Owner. ROD BLAGOJEVICH stated

45

they are going to go to Tribune Owner "before we pull the trigger on this deal" (believed to be a reference to helping Tribune Owner at the IFA).

75.    During an intercepted call on November 4, 2008, ROD BLAGOJEVICH spoke with Deputy Governor A. ROD BLAGOJEVICH told Deputy Governor A to think about the "Tribune stuff" and that he is going to talk to HARRIS as well. Deputy Governor A confirmed that he has people doing the "research right now." ROD BLAGOJEVICH, in discussing taking the issue to Tribune Owner, stated, "then we'll say, look, we got a problem at IFA. Here it is."

76.    During a subsequent intercepted call on November 4, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS. ROD BLAGOJEVICH discussed the Tribune editorials suggesting that ROD BLAGOJEVICH be impeached, and told HARRIS that they need to have a conversation with "[Tribune Financial Advisor]"[21] (as noted above, Tribune Financial Advisor is believed to be a top adviser to Tribune Owner who played a significant role in Tribune Owner's purchase of the Tribune), Cubs Chairman, and Tribune Owner and explain that the Tribune is writing editorials criticizing ROD BLAGOJEVICH for taking actions like those Tribune Owner wants ROD BLAGOJEVICH to take "on this Cubs deal at the IFA." ROD BLAGOJEVICH stated that because of the impeachment articles, "we don't know if we can take a chance and do this IFA deal now. I don't want to give them a

---

[21] Tribune Financial Advisor's first name was used by ROD BLAGOJEVICH and JOHN HARRIS during the conversations.

grounds to impeach me." ROD BLAGOJEVICH stated that "our recommendation is fire all those fucking people, get 'em the fuck out of there and get us some editorial support."

77.     During an intercepted call on November 5, 2008, ROD BLAGOJEVICH talked to JOHN HARRIS, Advisor A, and Spokesman, a State of Illinois employee who is the official spokesperson for the Governor's office. During part of the conversation, ROD BLAGOJEVICH instructed HARRIS to call someone at the Tribune and "lay a foundation with them." HARRIS agreed to call Tribune Financial Advisor. ROD BLAGOJEVICH told HARRIS to tell Tribune Financial Advisor "this is a serious thing now" and that the only "way around it" is around the legislature and that the Tribune is "trumping up impeachment discussions because I do this stuff to get things done." ROD BLAGOJEVICH told HARRIS to tell Tribune Financial Advisor that "everything is lined up, but before we go to the next level we need to have a discussion about what you guys are going to do about that newspaper." HARRIS stated that he "won't be so direct." ROD BLAGOJEVICH told HARRIS "yeah, you know what you got to say."

78.     During intercepted calls on November 6, 2008, ROD BLAGOJEVICH spoke with JOHN HARRIS. ROD BLAGOJEVICH mentioned a Chicago Tribune editorial published that day about "disservices" ROD BLAGOJEVICH had done to the State of Illinois and suggested that HARRIS call Tribune Financial Advisor about it. ROD Blagojevich and HARRIS then discussed a conversation HARRIS had with "[Tribune Financial Advisor]" the prior day. HARRIS said he told Tribune Financial Advisor that

47

things "look like they could move ahead fine but, you know, there is a risk that all of this is going to get derailed by your own editorial page." HARRIS said that he told Tribune Financial Advisor that they need to have a discussion on how they might tone things down and change the focus of "that page." HARRIS said that Tribune Financial Advisor said that is a delicate issue, that Tribune Financial Advisor wanted to come in and talk to HARRIS about it, and that Tribune Financial Advisor will talk to Tribune Owner preliminarily about it. Later in the conversation, ROD BLAGOJEVICH and HARRIS talked about an upcoming meeting HARRIS will have with an individual at the Tribune (believed to be Tribune Financial Advisor). HARRIS stated that he will tell the individual that in HARRIS's experience you cannot "tread lightly" and you need "to make wholesale changes." HARRIS stated that he will "throw it out there and let them figure out how to do it." ROD BLAGOJEVICH stated that HARRIS's suggestion will be to "get rid of these people" and that "the other point you want to make is in fact, we, we sure would like to get some editorial support from your paper. Okay?" HARRIS stated, "I want to do that in person." HARRIS stated that they will not get editorial support "out of the current crew." ROD BLAGOJEVICH said, "this is a priority. Stay on it right. I mean, he, he gets the message, doesn't he?" HARRIS replied, "Oh yeah. He got it loud and clear." In apparent reference to the prospect of IFA assistance for the Wrigley Field deal, ROD BLAGOJEVICH then asked, "what does this mean to them? Like $500 million? What does it mean to [Tribune Owner] in real terms?" HARRIS replied, "To them? About $100 million . . .maybe 150."

48

ROD BLAGOJEVICH said that he thought "it was worth like $500 million to 'em." ROD BLAGOJEVICH and HARRIS then discussed the details of the deal the Cubs are trying to get through the IFA. HARRIS said that it is basically a tax mitigation scheme where the IFA will "own title to the building" (believed to be Wrigley Field), and the Tribune will not "have to pay capital gains tax." HARRIS explained that the total gain to the Tribune is in the neighborhood of $100 million. ROD BLAGOJEVICH said, "$100 million is nothing to sneeze at. That's still worth something, isn't it?" HARRIS said he planned on seeing "[Tribune Financial Advisor]" the following Monday (November 10, 2008).

79. During an intercepted call on November 11, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS. ROD BLAGOJEVICH asked HARRIS about the Tribune issue. HARRIS said that he met with Tribune Financial Advisor the prior day (November 10, 2008), and that Tribune Financial Advisor talked to Tribune Owner and Tribune Owner "got the message and is very sensitive to the issue." HARRIS stated that according to Tribune Financial Advisor, there will be "certain corporate reorganizations and budget cuts coming and, reading between the lines, he's going after that section." ROD BLAGOJEVICH responded, "oh, that's fantastic." According to HARRIS, Tribune Financial Advisor did not acknowledge that "he interferes in that operation. . . but I got the clear feeling that, that he was, uh, very sensitive to our concerns." ROD BLAGOJEVICH asked HARRIS whether Tribune Financial Advisor understood the time line in which ROD BLAGOJEVICH wanted changes made in relation to "our ability to do this without the legislature" (believed to be a

reference to using the IFA to help with the Cubs financing). HARRIS stated "correct . . . November, December." ROD BLAGOJEVICH responded, "right." HARRIS said that he expects "before the end of this month [November] there's gonna be some reorganization or cuts" (believed to be a reference to changes in the editorial department). ROD BLAGOJEVICH replied, "Wow. Okay, keep our fingers crossed. You're the man. Good job, John."

80. During an intercepted call on November 20, 2008, ROD BLAGOJEVICH spoke with JOHN HARRIS. ROD BLAGOJEVICH began the conversation by asking HARRIS whether HARRIS is "making any progress on that Tribune editorial board with [Tribune Financial Advisor]?" HARRIS said he had not heard back from Tribune Financial Advisor. ROD BLAGOJEVICH directed HARRIS to "be smart and stay on top of that" and advised HARRIS that Spokesman just informed ROD BLAGOJEVICH that the Tribune editorial board was not willing to listen to Deputy Governor A and basically hung up on Deputy Governor A. ROD BLAGOJEVICH told HARRIS to touch base with Spokesman and Deputy Governor A. ROD BLAGOJEVICH told HARRIS to "keep talking to [Tribune Financial Advisor] about this." ROD BLAGOJEVICH then suggested that HARRIS could say the following to Tribune Financial Advisor: "What are we going to do? We've got this IFA thing. We want to do all this. How's that going?" ROD BLAGOJEVICH asked HARRIS if he understood what ROD BLAGOJEVICH wants, and told HARRIS to "use your judgment."

81. During an intercepted call on November 21, 2008, ROD BLAGOJEVICH spoke with JOHN HARRIS. ROD BLAGOJEVICH asked HARRIS whether he told Deputy Governor A that "McCormick is going to get bounced at the Tribune." (McCormick is believed to be John P. McCormick, the Chicago Tribune's Deputy Editorial Page Editor). HARRIS said "no, I told him (Deputy Governor A) that McCormick is in a bad mood," and that HARRIS was going "to check with [Tribune Financial Advisor] to see" whether "it was part of that message about the cuts on the Ed board." HARRIS stated, "I had singled out McCormick as somebody who was the most biased and unfair." ROD BLAGOJEVICH responded, "to [Tribune Financial Advisor] you did?" HARRIS confirmed that it was to Tribune Financial Advisor. ROD BLAGOJEVICH stated "that would be great," and McCormick is a "bad guy." ROD BLAGOJEVICH asked, "[Tribune Financial Advisor] is on top of this, right?" HARRIS replied that Tribune Financial Advisor said they would be "downsizing that division or changing personnel" and that Tribune Financial Advisor understands and "[Tribune Owner]" understands. ROD BLAGOJEVICH confirmed that HARRIS made the point with Tribune Financial Advisor that the Tribune is advocating that ROD BLAGOJEVICH be impeached for going around the legislature and that "is precisely what we're doing on Wrigley Field." HARRIS said he explained that information to Tribune Financial Advisor. ROD BLAGOJEVICH asked whether Tribune Financial Advisor understood that "we are not in a position where we can afford to do that if . . . the Tribune is pushing impeachment." ROD BLAGOJEVICH asked, "they got that, right?" HARRIS

replied, "right." HARRIS suggested to ROD BLAGOJEVICH that HARRIS explained to Tribune Financial Advisor that the Tribune's editorials discussing impeachment "could jeopardize our efforts to do good things for people as well as the other thing (helping the Cubs sale at the IFA)." ROD BLAGOJEVICH responded, "there ya go. He got the message?" HARRIS replied, "yeah." ROD BLAGOJEVICH stated "good."

82.     On November 21, 2008, approximately five minutes after the previous conversation with JOHN HARRIS, ROD BLAGOJEVICH spoke again with HARRIS. At the end of this call, ROD BLAGOJEVICH stated that "the Tribune thing is important, if we can get that." HARRIS replied, "delicate, very delicate." ROD BLAGOJEVICH said, "I know, I know. Use your judgment, don't push too hard. But you know what you got to do, right." HARRIS responded, "Alright, sir."

83.     After hearing that Tribune Financial Advisor had assured HARRIS that the Tribune would be downsizing or making personnel changes affecting the editorial board, ROD BLAGOJEVICH had a series of conversations with representatives of the Chicago Cubs regarding efforts to provide state financing for Wrigley Field. On November 30, 2008, ROD BLAGOJEVICH spoke with Sports Consultant, the president of a Chicago-area sports consulting firm, whose remarks during the conversation indicated that he was working with the Cubs on matters involving Wrigley Field. In that conversation, ROD BLAGOJEVICH and Sports Consultant discussed the importance of getting the IFA transaction approved at the IFA's December 2008 or January 2009 meeting, because ROD BLAGOJEVICH was

contemplating leaving office in early January 2009 and ROD BLAGOJEVICH's IFA appointees would still be in place to approve the IFA deal. On December 3, 2008, ROD BLAGOJEVICH spoke again with Sports Consultant and explained that ROD BLAGOJEVICH had control over state funds designated for use in connection with science and technology, and which could be used to pay for improvements at Wrigley Field. Later that same day, ROD BLAGOJEVICH spoke with Cubs Chairman and said that he could make state science and technology funds available to the Cubs without having to go through the legislature, and suggested that the Cubs come up with proposals that would allow the use of such funds.

84. On December 4, 2008, ROD BLAGOJEVICH spoke with Spokesman. On December 4, 2008, the Chicago Tribune announced it was reducing the size of its workforce by 11 members. During the phone conversation, Spokesman informed ROD BLAGOJEVICH that the Tribune had its "cuts" but that Spokesman did not think the "person we mentioned" was cut. ROD BLAGOJEVICH asked "McCormick?" Spokesman responded "right." ROD BLAGOJEVICH instructed Spokesman to "go tell HARRIS that." Spokesman stated he had already informed HARRIS of the information.

85. On the morning December 5, 2008, ROD BLAGOJEVICH spoke with JOHN HARRIS. On the morning of December 5, 2008, the Chicago Tribune ran a front page news story discussing an ongoing criminal investigation involving ROD BLAGOJEVICH. During the phone conversation, ROD BLAGOJEVICH and HARRIS discussed information

contained in the newspaper article. ROD BLAGOJEVICH stated "what's the deal? So, do McCormick stays at the Tribune, huh?" HARRIS stated "we haven't heard that he's gone, so." ROD BLAGOJEVICH stated "I mean, those layoffs were minor (the December 4, 2008 Tribune layoffs)." HARRIS stated "well, I know they got a lot to do." ROD BLAGOJEVICH asked "there's still more coming?" HARRIS responded "yeah, they got a lot of cuts to make." ROD BLAGOJEVICH stated "okay, at some point we should talk to [Tribune Financial Advisor] again, right?" HARRIS confirmed they should talk to Tribune Financial Advisor again.

### 4. Evidence Concerning Efforts to Obtain Personal Benefits for ROD BLAGOJEVICH in Return for his Appointment of a United States Senator

86. Intercepted phone calls demonstrate that ROD BLAGOJEVICH, JOHN HARRIS, and others have engaged and are engaged in efforts to obtain personal gain, including financial gain, for the benefit of ROD BLAGOJEVICH and his family through the corrupt use of ROD BLAGOJEVICH's authority as Governor of the State of Illinois to fill the vacant United States Senate Seat previously held by the President-elect.

87. By law, after the President-elect's resignation of his position as a U.S. Senator, which was effective on November 16, 2008, ROD BLAGOJEVICH has sole authority to appoint his replacement for the two years remaining of the President-elect's Senate term. *See* 10 ILCS 5/25-8. During the course of this investigation, agents have intercepted a series of communications regarding the efforts of ROD BLAGOJEVICH, JOHN HARRIS, and others

to misuse this power to obtain personal gain, including financial gain, for ROD BLAGOJEVICH and his family. In particular, ROD BLAGOJEVICH has been intercepted conspiring to trade the senate seat for particular positions that the President-elect has the power to appoint (e.g. the Secretary of Health and Human Services). ROD BLAGOJEVICH has also been intercepted conspiring to sell the Senate seat in exchange for his wife's placement on paid corporate boards or ROD BLAGOJEVICH's placement at a private foundation in a significant position with a substantial salary. ROD BLAGOJEVICH has also been intercepted conspiring to sell the Senate seat in exchange for millions of dollars in funding for a non-profit organization that he would start and that would employ him at a substantial salary after he left the governorship.

88. Set out below are summaries of certain of the conversations referenced above. This affidavit does not include all calls dealing with the corrupt efforts of ROD BLAGOJEVICH, JOHN HARRIS, and others to misuse the power of ROD BLAGOJEVICH to appoint a United States Senator for the personal gain of ROD BLAGOJEVICH and his family, nor does this affidavit set forth other calls where ROD BLAGOJEVICH and others discussed a possible appointment to the Senate seat based on considerations other than financial gain for ROD BLAGOJEVICH and his family, discussions which took place with greater frequency after efforts to arrange for a private job for ROD BLAGOJEVICH in exchange for appointing a particular candidate to the open Senate seat did not meet with success. As set forth below, more recent discussions focused

on an effort to obtain campaign contributions up front in consideration of an appointment to the Senate.

89.     On November 3, 2008, ROD BLAGOJEVICH talked with Deputy Governor A. This discussion occurred the day before the United States Presidential election. ROD BLAGOJEVICH and Deputy Governor A discussed the potential Senate seat vacancy. During the conversation, ROD BLAGOJEVICH told Deputy Governor A that if he is not going to get anything of value for the open Senate seat, then ROD BLAGOJEVICH will take the Senate seat himself: "if . . . they're not going to offer anything of any value, then I might just take it."

90.     Later on November 3, 2008, ROD BLAGOJEVICH spoke with Advisor A. By this time, media reports indicated that Senate Candidate 1, an advisor to the President-elect, was interested in the Senate seat if it became vacant, and was likely to be supported by the President-elect. During the call, ROD BLAGOJEVICH stated, "unless I get something real good for [Senate Candidate 1], shit, I'll just send myself, you know what I'm saying." ROD BLAGOJEVICH later stated, "I'm going to keep this Senate option for me a real possibility, you know, and therefore I can drive a hard bargain. You hear what I'm saying. And if I don't get what I want and I'm not satisfied with it, then I'll just take the Senate seat myself." Later, ROD BLAGOJEVICH stated that the Senate seat "is a fucking valuable thing, you just don't give it away for nothing."

91.     On November 4, 2008, ROD BLAGOJEVICH spoke with Deputy Governor A. This was the same day as the United States Presidential election. With respect to the Senate seat, Deputy Governor A suggested putting together a list of things that ROD BLAGOJEVICH would accept in exchange for the Senate seat. ROD BLAGOJEVICH responded that the list "can't be in writing." Thereafter, ROD BLAGOJEVICH discussed whether he could obtain an ambassadorship in exchange for the Senate seat.

92.     On November 4, 2008, ROD BLAGOJEVICH spoke with JOHN HARRIS regarding the potential vacant Senate seat. ROD BLAGOJEVICH stated that the "trick . . . is how do you conduct indirectly . . . a negotiation" for the Senate seat. Thereafter, ROD BLAGOJEVICH analogized his situation to that of a sports agent shopping a potential free agent to various teams, stating "how much are you offering, [President-elect]? What are you offering, [Senate Candidate 2]? . . . Can always go to. . . [Senate Candidate 3]." Later ROD BLAGOJEVICH stated that he will make a decision on the Senate seat "in good faith . . . but it is not coming for free. . . .It's got to be good stuff for the people of Illinois and good for me." ROD BLAGOJEVICH states "[President-elect], you want it? Fine. But, its got to be good or I could always take [the Senate seat]."

93.     On November 5, 2008, ROD BLAGOJEVICH spoke with Deputy Governor A regarding positions that ROD BLAGOJEVICH might be able to obtain in exchange for the soon-to-be vacated Senate seat. Among the potential positions discussed were Secretary of Health and Human Services and various ambassadorships. Deputy Governor A noted that

the cabinet position of Secretary of the Energy is "the one that makes the most money." Deputy Governor A stated that it is hard not to give the Secretary of Energy position to a Texan, but with ROD BLAGOJEVICH's coal background it might be a possibility.

94.     On November 5, 2008, ROD BLAGOJEVICH spoke with JOHN HARRIS regarding what ROD BLAGOJEVICH could obtain for the Senate seat. After discussing various federal governmental positions that ROD BLAGOJEVICH would trade the Senate seat for, ROD BLAGOJEVICH asked about "the private sector" and whether the President-elect could "put something together there. . . .Something big." Thereafter, HARRIS suggested that the President-elect could make ROD BLAGOJEVICH the head of a private foundation. ROD BLAGOJEVICH told HARRIS that he should do "homework" on private foundations "right away." ROD BLAGOJEVICH asked whether he could get a high-ranking position at the Red Cross. HARRIS stated that "it's got to be a group that is dependent on [the President-elect]," and that a President probably could not influence the Red Cross. ROD BLAGOJEVICH told HARRIS to "look into all of those."

95.     On November 5, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS and Deputy Governor A. They discussed potential private foundations with which ROD BLAGOJEVICH might be able to get a position in exchange for filling the Senate seat and, in particular, those foundations that are "heavily dependent on federal aid" and which, therefore, the White House would have the most "influence" on. ROD BLAGOJEVICH wanted to know how much the positions being discussed pay.

96.     On November 5, 2008, ROD BLAGOJEVICH talked with Advisor A about the Senate seat. During the phone call, ROD BLAGOJEVICH stated that the President-elect can remove somebody from a foundation and give the spot to ROD BLAGOJEVICH. In regards to the Senate seat, ROD BLAGOJEVICH stated "I've got this thing and it's fucking golden, and, uh, uh, I'm just not giving it up for fuckin' nothing. I'm not gonna do it. And, and I can always use it. I can parachute me there."

97.     On November 6, 2008, ROD BLAGOJEVICH talked with Spokesman. ROD BLAGOJEVICH told Spokesman to leak to a particular columnist for the Chicago Sun-Times, that Senate Candidate 2 is in the running for the vacant Senate seat. According to ROD BLAGOJEVICH, by doing this, he wanted "to send a message to the [President-elect's] people," but did not want it known that the message was from ROD BLAGOJEVICH. Thereafter, ROD BLAGOJEVICH and Spokesman discussed specific language that should be used in the Sun Times column and arguments as to why Senate Candidate 2 made sense for the vacant Senate seat. A review of this particular Sun Times column on November 7, 2008, indicates references to the specific language and arguments regarding Senate Candidate 2 as a potential candidate for the Senate seat, as discussed by ROD BLAGOJEVICH and Spokesman.

98.     On November 7, 2008, ROD BLAGOJEVICH talked with Advisor A about the Senate seat. ROD BLAGOJEVICH stated that he is willing to "trade" the Senate seat to

Senate Candidate 1 in exchange for the position of Secretary of Health and Human Services in the President-elect's cabinet.

99.     Later on November 7, 2008, ROD BLAGOJEVICH discussed the open Senate seat in a three-way call with JOHN HARRIS and Advisor B, a Washington D.C.-based consultant. ROD BLAGOJEVICH indicated in the call that if he was appointed as Secretary of Health and Human Services by the President-elect, then ROD BLAGOJEVICH would appoint Senate Candidate 1 to the open Senate seat. HARRIS stated "we wanted our ask to be reasonable and rather than. . .make it look like some sort of selfish grab for a quid pro quo." ROD BLAGOJEVICH stated that he needs to consider his family and that he is "financially" hurting. HARRIS said that they are considering what will help the "financial security" of the Blagojevich family and what will keep ROD BLAGOJEVICH "politically viable." ROD BLAGOJEVICH stated, "I want to make money." During the call, ROD BLAGOJEVICH, HARRIS, and Advisor B discussed the prospect of working a three-way deal for the open Senate seat. HARRIS noted that ROD BLAGOJEVICH is interested in taking a high-paying position with an organization called "Change to Win," which is connected to Service Employees International Union ("SEIU").[22] HARRIS suggested that SEIU Official make ROD BLAGOJEVICH the head of Change to Win and, in exchange, the President-elect could help Change to Win with its legislative agenda on a national level.

---

[22] Open source information indicates that Change to Win is an organization affiliated with seven unions, including SEIU, and appears to be focused on having the affiliated unions work together on matters of common interest. SEIU Official is affiliated with SEIU.

Advisor B asked why SEIU Official cannot just give the job to ROD BLAGOJEVICH. HARRIS responded that it would be just a big "give away" for SEIU Official and Change to Win since there are already individuals on the Change to Win payroll doing the functions of the position that would be created for ROD BLAGOJEVICH. HARRIS said that Change to Win will want to trade the job for ROD BLAGOJEVICH for something from the President-elect. HARRIS suggested a "three-way deal," and explained that a three-way deal like the one discussed would give the President-elect a "buffer so there is no obvious quid pro quo for [Senate Candidate 1]." ROD BLAGOJEVICH stated that for him to give up the governorship for the Change to Win position, the Change to Win position must pay a lot more than he is getting paid right now. Advisor B said that he liked the idea of the three-way deal. ROD BLAGOJEVICH stated that he is interested in making $250,000 to $300,000 and being on some organization boards. Advisor B said they should leverage the President-elect's desire to have Senate Candidate 1 appointed to the Senate seat in order to get a head position with Change to Win and a salary. Advisor B agreed that the three-way deal would be a better plan than ROD BLAGOJEVICH appointing Senate Candidate 2 to the Senate seat and getting more done as Governor.

100.    On November 8, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS about the Senate seat. During the conversation, ROD BLAGOJEVICH and HARRIS discussed whether it would be possible to obtain a financial benefit for ROD BLAGOJEVICH's wife in relation to the Senate seat. Specifically, ROD BLAGOJEVICH

referred to his wife's Series 7 license[23] and asked "is there a play here, with these guys, with her" to work for a firm in Washington or New York at a significantly better salary than she is making now. Also, ROD BLAGOJEVICH wanted to know whether SEIU could do something to get his wife a position at Change to Win until ROD BLAGOJEVICH could take a position at Change to Win.

101.    On November 10, 2008, ROD BLAGOJEVICH, his wife, JOHN HARRIS, Governor General Counsel, and various Washington-D.C. based advisors, including Advisor B, discussed the open Senate seat during a conference call. (The Washington D.C.-based advisors to ROD BLAGOJEVICH are believed to have participated on this call from Washington D.C.). Various individuals participated at different times during the call. The call lasted for approximately two hours, and what follows are simply summaries of various portions of the two-hour call.

a.      ROD BLAGOJEVICH expressed his interest in figuring out a way to make money and build some financial security, while at the same time potentially participating in the political arena again. ROD BLAGOJEVICH mentioned the Senate seat, the dynamics of a new Presidential administration with the strong contacts that ROD BLAGOJEVICH has in it, and asked what if anything he can do to make that work for him and his wife and his responsibilities as Governor of Illinois.  ROD BLAGOJEVICH

---

[23] A Series 7 license is the most comprehensive of several securities licenses and permits an agent to communicate with retail investors.

suggested during the call that he could name himself to the open Senate seat to avoid impeachment by the State of Illinois legislature. ROD BLAGOJEVICH agreed it was unlikely that the President-elect would name him Secretary of Health and Human Services or give him an ambassadorship because of all of the negative publicity surrounding ROD BLAGOJEVICH.

      b.    ROD BLAGOJEVICH asked what he can get from the President-elect for the Senate seat. ROD BLAGOJEVICH stated that Governor General Counsel believes the President-elect can get ROD BLAGOJEVICH's wife on paid corporate boards in exchange for naming the President-elect's pick to the Senate. Governor General Counsel asked, "can [the President-elect] help in the private sector. . . where it wouldn't be tied to him? . . .I mean, so it wouldn't necessarily look like one for the other." ROD BLAGOJEVICH's wife suggested during the call that she is qualified to sit on corporate boards and has a background in real estate and appraisals. ROD BLAGOJEVICH asked whether there is something that could be done with his wife's "series 7" license in terms of working out a deal for the Senate seat. ROD BLAGOJEVICH stated that he is "struggling" financially and does "not want to be Governor for the next two years."

      c.    ROD BLAGOJEVICH said that the consultants (Advisor B and another consultant are believed to be on the call at that time) are telling him that he has to "suck it up" for two years and do nothing and give this "motherfucker [the President-elect] his senator. Fuck him. For nothing? Fuck him." ROD BLAGOJEVICH states that he will put

"[Senate Candidate 4]" in the Senate "before I just give fucking [Senate Candidate 1] a fucking Senate seat and I don't get anything." (Senate Candidate 4 is a Deputy Governor of the State of Illinois). ROD BLAGOJEVICH stated that he needs to find a way to take the "financial stress" off of his family and that his wife is as qualified or more qualified than another specifically named individual to sit on corporate boards. According to ROD BLAGOJEVICH, "the immediate challenge [is] how do we take some of the financial pressure off of our family." Later in the phone call, ROD BLAGOJEVICH stated that absent getting something back, ROD BLAGOJEVICH will not pick Senate Candidate 1. HARRIS re-stated ROD BLAGOJEVICH's thoughts that they should ask the President-elect for something for ROD BLAGOJEVICH's financial security as well as maintain his political viability. HARRIS said they could work out a three-way deal with SEIU and the President-elect where SEIU could help the President-elect with ROD BLAGOJEVICH's appointment of Senate Candidate 1 to the vacant Senate seat, ROD BLAGOJEVICH would obtain a position as the National Director of the Change to Win campaign, and SEIU would get something favorable from the President-elect in the future.

      d.     One of ROD BLAGOJEVICH's advisors said he likes the idea, it sounds like a good idea, but advised ROD BLAGOJEVICH to be leery of promises for something two years from now. ROD BLAGOJEVICH's wife said they would take the job now. Thereafter, ROD BLAGOJEVICH and others on the phone call discussed various ways

64

ROD BLAGOJEVICH can "monetize" the relationships he is making as Governor to make money after ROD BLAGOJEVICH is no longer Governor.

102.    Later on November 10, 2008, ROD BLAGOJEVICH and Advisor A discussed the open Senate seat. Among other things, ROD BLAGOJEVICH raised the issue of whether the President-elect could help get ROD BLAGOJEVICH's wife on "paid corporate boards right now." Advisor A responded that he "think[s] they could" and that a "President-elect . . . can do almost anything he sets his mind to." ROD BLAGOJEVICH states that he will appoint "[Senate Candidate 1] . . . but if they feel like they can do this and not fucking give me anything . . . then I'll fucking go [Senate Candidate 5]." (Senate Candidate 5 is publicly reported to be interested in the open Senate seat). ROD BLAGOJEVICH stated that if his wife could get on some corporate boards and "picks up another 150 grand a year or whatever" it would help ROD BLAGOJEVICH get through the next several years as Governor.

103.    Later on November 10, 2008, ROD BLAGOJEVICH and Advisor A again discussed the open Senate seat. ROD BLAGOJEVICH and Advisor A discussed leaking to the same particular Chicago Sun-Times columnist that ROD BLAGOJEVICH is seriously considering Senate Candidate 5 for the open Senate seat, in order to send a message to the President-elect that there are options for the Senate seat beyond Senate Candidate 1. At the end of the conversation Advisor A agreed to call the Sun Times columnist to leak the story (believed, based on other intercepted conversations, to be untrue), that ROD

BLAGOJEVICH had a "long, productive discussion" with Senate Candidate 5 regarding the open Senate seat.

104.     On November 11, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS about the Senate seat. ROD BLAGOJEVICH suggested starting a 501(c)(4) organization (a non-profit organization that may engage in political activity and lobbying) and getting "his (believed to be the President-elect's) friend Warren Buffett or some of those guys to help us on something like that." HARRIS asked, "what, for you?" ROD BLAGOJEVICH replied, "yeah." Later in the conversation, ROD BLAGOJEVICH stated that if he appoints Senate Candidate 4 to the Senate seat and, thereafter, it appears that ROD BLAGOJEVICH might get impeached, he could "count on [Senate Candidate 4], if things got hot, to give [the Senate seat] up and let me parachute over there." HARRIS said, "you can count on [Senate Candidate 4] to do that." Later in the conversation, ROD BLAGOJEVICH said he knows that the President-elect wants Senate Candidate 1 for the Senate seat but "they're not willing to give me anything except appreciation. Fuck them."

105.     Later on November 11, 2008, ROD BLAGOJEVICH talked with Advisor A. Advisor A indicated that he will stay "on top" of getting the Senate Candidate 5 information leaked to the particular Sun Times columnist. ROD BLAGOJEVICH again raised the idea of the 501(c)(4) organization and asked whether "they" (believed be the President-elect and his associates) can get Warren Buffett and others to put $10, $12, or $15 million into the organization. Advisor A responded that "they" should be able to find a way to fund the

organization. Later in the conversation, ROD BLAGOJEVICH returned to the issue of the 501(c)(4) organization and noted that he is looking for "$10, $15, $20 million in an organization like that." ROD BLAGOJEVICH said that when he is "no longer Governor" he could go over to the organization. ROD BLAGOJEVICH said that "[Senate Candidate 6]" (Senate Candidate 6, based on other intercepted conversations, is believed to be a wealthy person from Illinois) "could raise me money like that for a Senate seat." ROD BLAGOJEVICH asked, "if I get [Senate Candidate 6] to do something like that, is it worth giving him the Senate seat?" Advisor A responded that it would be hard to put Senate Candidate 6 in the Senate seat. ROD BLAGOJEVICH said that it would be better than putting Senate Candidate 1 in the Senate and not getting anything back. Later in the conversation, ROD BLAGOJEVICH and Advisor A again discussed the possibility of a 501(c)(4) organization, and ROD BLAGOJEVICH again noted that "[Senate Candidate 6]" could "do it." ROD BLAGOJEVICH and Advisor A discussed who might be close to Senate Candidate 6 to talk with him about the issue, because ROD BLAGOJEVICH did not "want to be the one to ask something like that." Advisor A agreed to find out who is close to Senate Candidate 6.

106. On November 12, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS. ROD BLAGOJEVICH noted that CNN is reporting that Senate Candidate 1 does not want the open Senate seat. HARRIS said he thought that is just a tactic. ROD BLAGOJEVICH raised the issue of the 501(c)(4) organization and that contributors and others can put "10 to

15 million in it so I can advocate health care and other issues I care about and help them, while I stay as Governor, she's (believed to be Senate Candidate 1) a Senator." ROD BLAGOJEVICH noted that the President-elect can ask Warren Buffett, Bill Gates, and others for money for the organization. ROD BLAGOJEVICH states he will ask "[Senate Candidate 6]" to help fund it as well. HARRIS said that funding the 501(c)(4) would be a lot easier for the President-elect than appointing ROD BLAGOJEVICH to a position. ROD BLAGOJEVICH said, "They could say 'hey, we get [Senate Candidate 1]. Let's help this guy have a 501(c)(4) issue advocacy organization. Let's fund it to the level that he's asked for and then we'll get [Senate Candidate 1].'" ROD BLAGOJEVICH said that he will control the 501(c)(4) organization through a board of directors while he is Governor, and then a position in the 501(c)(4) would be waiting for him when he was no longer Governor.

107.    On November 12, 2008, ROD BLAGOJEVICH talked with Advisor B. ROD BLAGOJEVICH discussed with Advisor B his idea for a 501(c)(4) organization. Advisor B stated that he likes the idea, but liked the Change to Win option better because, according to Advisor B, from the President-elect's perspective, there would be fewer "fingerprints" on the President-elect's involvement with Change to Win because Change to Win already has an existing stream of revenue and, therefore, "you won't have stories in four years that they bought you off." ROD BLAGOJEVICH said that he likes the 501(c)(4) idea because he knows it will be there in two years when he is no longer Governor, whereas Change to Win might not be.

68

108.    On November 12, 2008, ROD BLAGOJEVICH talked with one of his Washington D.C.-based advisors.    ROD BLAGOJEVICH explained the 501(c)(4) organization idea to the advisor, and that "[the President-elect] gets these Warren Buffett types to [fund it]." The advisor asked ROD BLAGOJEVICH if the 501(c)(4) is a real effort or just a vehicle to help ROD BLAGOJEVICH. ROD BLAGOJEVICH stated that it is a real effort but also a place for ROD BLAGOJEVICH to go when he is no longer Governor. The advisor said he likes the Change to Win idea better, and notes that it is more likely to happen because it is one step removed from the President-elect.

109.    On November 12, 2008, ROD BLAGOJEVICH spoke with SEIU Official, who was in Washington, D.C. Prior intercepted phone conversations indicate that approximately a week before this call, ROD BLAGOJEVICH met with SEIU Official to discuss the vacant Senate seat, and ROD BLAGOJEVICH understood that SEIU Official was an emissary to discuss Senate Candidate 1's interest in the Senate seat. During the conversation with SEIU Official on November 12, 2008, ROD BLAGOJEVICH informed SEIU Official that he had heard the President-elect wanted persons other than Senate Candidate 1 to be considered for the Senate seat. SEIU Official stated that he would find out if Senate Candidate 1 wanted SEIU Official to keep pushing her for Senator with ROD BLAGOJEVICH. ROD BLAGOJEVICH said that "one thing I'd be interested in" is a 501(c)(4) organization. ROD BLAGOJEVICH explained the 501(c)(4) idea to SEIU Official and said that the 501(c)(4)

could help "our new Senator [Senate Candidate 1]." SEIU Official agreed to "put that flag up and see where it goes."

110.  On November 12, 2008, ROD BLAGOJEVICH talked with Advisor B. ROD BLAGOJEVICH told Advisor B that he told SEIU Official, "I said go back to [Senate Candidate 1], and, and say hey, look, if you still want to be a Senator don't rule this out and then broach the idea of this 501(c)(4) with her."

111.  Later on November 12, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS. ROD BLAGOJEVICH stated that his decision about the open Senate seat will be based on three criteria in the following order of importance: "our legal situation, our personal situation, my political situation. This decision, like every other one, needs to be based upon on that. Legal. Personal. Political." HARRIS said, "legal is the hardest one to satisfy." ROD BLAGOJEVICH said that his legal problems could be solved by naming himself to the Senate seat.

112.  On November 13, 2008, ROD BLAGOJEVICH talked with JOHN HARRIS. ROD BLAGOJEVICH said he wanted to be able to call "[President-elect Advisor]" and tell President-elect Advisor that "this has nothing to do with anything else we're working on but the Governor wants to put together a 501(c)(4)" and "can you guys help him. . . raise 10, 15 million." ROD BLAGOJEVICH said he wanted "[President-elect Advisor] to get the word today," and that when "he asks me for the Fifth CD thing I want it to be in his head." (The reference to the "Fifth CD thing" is believed to relate to a seat in the United States House of

Representatives from Illinois' Fifth Congressional District. Prior intercepted phone conversations indicate that ROD BLAGOJEVICH and others were determining whether ROD BLAGOJEVICH has the power to appoint an interim replacement until a special election for the seat can be held.).

113. Also on November 13, 2008, ROD BLAGOJEVICH talked with Advisor A. ROD BLAGOJEVICH said he wants the idea of the 501(c)(4) in President-elect Advisor's head, but not in connection with the Senate appointment or the congressional seat. Advisor A asked whether the conversation about the 501(c)(4) with President-elect Advisor is connected with anything else. ROD BLAGOJEVICH replied that "it's unsaid. It's unsaid."

114. Later on November 13, 2008, ROD BLAGOJEVICH spoke with Advisor A. ROD BLAGOJEVICH asked Advisor A to call Individual A and have Individual A pitch the idea of the 501(c)(4) to "[President-elect Advisor]." Advisor A said that, "while it's not said this is a play to put in play other things." ROD BLAGOJEVICH responded, "correct." Advisor A asked if this is "because we think there's still some life in [Senate Candidate 1] potentially?" ROD BLAGOJEVICH said, "not so much her, but possibly her. But others."

115. Throughout the past month, ROD BLAGOJEVICH has continued to engage in numerous conversations relating to filling the open Senate seat. In these conversations, he has repeatedly discussed the attributes of potential candidates, including, among other things, the candidates' ability to benefit the State of Illinois, and the personal and political

71

benefits for himself and his family of appointing particular candidates. These calls have included the following:

      a.      On December 4, 2008, ROD BLAGOJEVICH spoke to Advisor B and informed Advisor B that he was giving Senate Candidate 5 greater consideration for the Senate seat because, among other reasons, if ROD BLAGOJEVICH ran for re-election Senate Candidate 5 would "raise[] money" for ROD BLAGOJEVICH, although ROD BLAGOJEVICH said he might "get some (money) up front, maybe" from Senate Candidate 5 to insure Senate Candidate 5 kept his promise about raising money for ROD BLAGOJEVICH. (In a recorded conversation on October 31, 2008, ROD BLAGOJEVICH described an earlier approach by an associate of Senate Candidate Five as follows: "We were approached 'pay to play.' That, you know, he'd raise me 500 grand. An emissary came. Then the other guy would raise a million, if I made him (Senate Candidate 5) a Senator.")

      b.      Later on December 4, 2008, ROD BLAGOJEVICH spoke to Fundraiser A. ROD BLAGOJEVICH stated he was "elevating" Senate Candidate 5 on the list of candidates for the open Senate seat. ROD BLAGOJEVICH stated he might be able to cut a deal with Senate Candidate 5 that provided ROD BLAGOJEVICH with something "tangible up front." ROD BLAGOJEVICH noted he was going to meet with Senate Candidate 5 in the next few days. ROD BLAGOJEVICH told Fundraiser A to reach out to Individual D, an individual who ROD BLAGOJEVICH is attempting to obtain campaign contributions from and who, based on intercepted phone calls, ROD BLAGOJEVICH

believes to be close to Senate Candidate 5. ROD BLAGOJEVICH told Fundraiser A to tell Individual D that Senate Candidate 5 was very much a realistic candidate for the open Senate seat, but that ROD BLAGOJEVICH was getting "a lot of pressure" not to appoint Senate Candidate 5. ROD BLAGOJEVICH told Fundraiser A to tell Individual D that ROD BLAGOJEVICH had a problem with Senate Candidate 5 just promising to help ROD BLAGOJEVICH because ROD BLAGOJEVICH had a prior bad experience with Senate Candidate 5 not keeping his word. ROD BLAGOJEVICH told Fundraiser A to tell Individual D that if Senate Candidate 5 is going to be chosen to fill the Senate seat "some of this stuffs gotta start happening now . . .right now. . . and we gotta see it. You understand?" ROD BLAGOJEVICH told Fundraiser A that "you gotta be careful how you express that and assume everybody's listening, the whole world is listening. You hear me?" ROD BLAGOJEVICH told Fundraiser A to tell Individual D if there is "tangible political support (campaign contributions) like you've said, start showing us now." Fundraiser A stated he will call Individual D on the phone to communicate ROD BLAGOJEVICH's message. ROD BLAGOJEVICH responded that "I would do it in person. I would not do it on the phone." ROD BLAGOJEVICH told Fundraiser A to communicate the "urgency" of the situation to Individual D.

        c.       On December 5, 2008, ROD BLAGOJEVICH spoke to Fundraiser A. On the morning of December 5, 2008, the Chicago Tribune ran a front page news story stating that ROD BLAGOJEVICH had recently been surreptitiously recorded in relation to

an ongoing criminal investigation. During the conversation on December 5, 2008, ROD BLAGOJEVICH and Fundraiser A discuss certain information contained in the newspaper story. ROD BLAGOJEVICH instructed Fundraiser A to "undo your [Individual D] thing." Fundraiser A confirmed that it would be undone.

        d.    Also on December 5, 2008, after publication of the Tribune article described above, ROD BLAGOJEVICH and three others discussed whether to move money out of the Friends of Blagojevich campaign fund to avoid having the money frozen and also considered the possibility of prepaying the money to ROD BLAGOJEVICH's criminal defense attorney with an understanding that the attorney would donate the money back at a later time if it was not needed. They also discussed opening a new fund raising account named Citizens for Blagojevich with new contributions received.

        116.    In addition, in the course of the conversations over the last month, ROD BLAGOJEVICH has spent significant time weighing the option of appointing himself to the open Senate seat, and has expressed a variety of reasons for doing so, including frustration at being "stuck" as governor, a belief that he will be able to obtain greater resources if he is indicted as a sitting Senator as opposed to a sitting governor, and a desire to remake his image in consideration of a possible run for President in 2016, avoid impeachment by the Illinois legislature, make corporate contacts that would be of value to him after leaving public office, facilitate his wife's employment as a lobbyist, and assist in generating speaking fees should he decide to leave public office.

74

## III.  CONCLUSION

117.  Based upon the facts set forth in this affidavit, I believe that there is probable cause to believe that: (a) ROD BLAGOJEVICH and JOHN HARRIS, and others have conspired with each other and with others to commit offenses against the United States, namely to devise and participate in a scheme to defraud the State of Illinois and the people of the State of Illinois of the honest services of ROD BLAGOJEVICH and JOHN HARRIS, in furtherance of which the mails and interstate wire communications would be used, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; all in violation of Title 18, United States Code, Section 1349; and (b) ROD BLAGOJEVICH and JOHN HARRIS, being agents of the State of Illinois, a State government which during a one-year period, beginning January 1, 2008 and continuing to the present, received federal benefits in excess of $10,000, corruptly solicited and demanded a thing of value, namely, the firing of certain Chicago Tribune editorial members responsible for widely-circulated editorials critical of ROD BLAGOJEVICH, intending to be influenced and rewarded in connection with business and transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the provision of millions of dollars in financial assistance by the State of

Illinois, including through the Illinois Finance Authority, to the Tribune Company involving the Wrigley Field baseball stadium; in violation of Title 18, United States Code, Sections 666 (a)(1)(B) and 2. Accordingly, it is requested that arrest warrants be issued as detailed in this affidavit.

Daniel W. Cain
Special Agent
Federal Bureau of Investigation

Sworn to before me this
7 day of December 2008.

HONORABLE MICHAEL T. MASON
Magistrate Judge
Northern District of Illinois

76